**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| **Donald M. Dziwulski** | * | |
| **Plaintiff** | * | |
| | * | |
| v. | * | **Civil Action Number: <u>18-cv-00277-SAG</u>** |
| | * | |
| **Mayor & City Council Of Baltimore** | * | |
| **Defendant** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# PLAINTIFF'S RESPONSE TO DEFENDANT'S
# MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

Stephen B. Lebau, Esq.
LEBAU & NEUWORTH, LLC
606 Baltimore Avenue – Suite 201
Towson, Maryland 21204
Attorneys for Plaintiff

# TABLE OF CONTENTS

| | Page |
|---|---|
| Table Of Authorities | iv |
| Table Of Plaintiff's Exhibits | vii |
| I. Undisputed Facts - Summary | 1 |
|     **A.** May 2013 Promotion Denial | 1 |
|     **B.** June 26, 2013 Promotion Denial | 2 |
|     **C.** November 2013 To February 2014 – Acting BC Pay & Third New BC Position Vacant | 2 |
|     **D.** January – March 2014 Reporting Of Discrimination & EEOC Determinations | 3 |
|     **E.** Destruction Of Internal EEO Materials | 4 |
|     **F.** Governing Employment Policies | 4 |
|     **G.** The City's Stated Desire To Increase Diversity Within BC Ranks | 6 |
| **II.** Genuine Disputes Of Material Fact | 6 |
|     **A.** May 13, 2013 Promotion Denial Because Of Race | 6 |
|         **1.** Race Facts - Background | 6 |
|         **2.** The April To Pre-May 8, 2013 Race-Motivated Push To Promote Claggett And Stokes | 9 |
|         **3.** May 9 To May 13, 2013 Facts | 10 |
|         **4.** Misuse Of, And Noncompliance With, Rules To Cover-Up The Discrimination | 13 |
|             **a.** The 2011 List Expired At Midnight Between May 12 And 13, 2013 | 13 |
|             **b.** The Civil Service Commission Rules Did Not Permit The BCFD Action. | 13 |
|             **c.** No "In Lieu Of" Policy Or Practice Permitted The BCFD Action. | 14 |
|             **d.** BCFD Intentionally Ignored The Governing Promotion Policies. | 17 |
|         **5.** The BCFD Claimed Use Of The "In Lieu Of" Policy Is Itself Not Credible. | 17 |
|     **B.** June 26, 2013 Promotion Denial Because Of Race | 18 |
|     **C.** February 2014 Retaliation, Stopping Acting Battalion Chief Pay | 19 |
|     **D.** April 2014 Retaliatory And Discriminatory Reclassification Of BC Position | 21 |
| **III.** Governing Summary Judgment Principles | 22 |
| **IV.** Summary Judgment Should Be Denied; Plaintiff Was Discriminated Because Of His Race. | 23 |
|     **A.** Plaintiff Was Denied A BC Promotion Under Circumstances Giving Rise To An Inference Of Discrimination. | 23 |
|         **1.** The May 2013 Promotion Denial | 24 |
|         **2.** The June 2013 Promotion Denial | 24 |
|         **3.** January 2014 Promotion Denial And Thereafter | 25 |
|     **B.** There Is Ample & Compelling Evidence Of Pretext Requiring That The Promotion Discrimination Claims Proceed To Trial. | 25 |
|         **1.** Pretext Evidence That Plaintiff Was Not Promoted To BC In May 2013 Because Of Race | 26 |
|             **a.** Clack's Exercise Of Discretion, With The Timing Of His Decision And The City's Push For African Americans, Establish Pretext. | 26 |
|             **b.** Clack's Lack Of Recollection And "Not Knowing" Evidence Pretext. | 28 |
|             **c.** The BCFD's Blatant Disregard Of Governing Rules Provides Compelling Evidence Of Pretext. | 29 |

| | | |
|---|---|---|
| **d.** | The BCFD's Evolving After-The-Fact Distorted Reliance On Clearly Inapplicable Rules Provides Persuasive Pretext Evidence. | 31 |
| **e.** | The Destruction Of EEO Files, At The Very Least, Requires A Pretext Finding. | 33 |
| **f.** | The Procedural Irregularities Show Pretext. | 33 |
| **g.** | The Two Central Documents Relied Upon By The City Are Suspect And Probative Of Pretext. | 34 |
| **2.** | Pretext Evidence That Plaintiff Was Not Promoted To BC In June 2013 Because Of Race | 36 |
| **3.** | Pretext Evidence That Plaintiff Not Promoted In January 2014 And Thereafter Because Of Race | 36 |
| **V.** | Summary Judgment Should Be Denied; Plaintiff Was Retaliated Against. | 38 |
| **A.** | Plaintiff's Out-Of-Title Pay Was Discontinued Because Of His Protected Activity. | 38 |
| **B.** | The BCFD Retaliated Against Plaintiff By Abolishing The BC Position Into Which He Should Have Been Promoted. | 40 |
| **VI.** | Conclusion | 41 |

## TABLE OF AUTHORITIES

| Cases | Page |
|---|---|
| *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970) | 22 |
| *Barnett v. Lowes Home Ctrs., LLC*, 2019 U.S. Dist. LEXIS 34645 (E.D. Pa. Mar. 4, 2019) | 41 |
| *Basil v. Md. Transp. Auth.*, 2014 U.S. Dist. LEXIS 56677 (D. Md. Apr. 23, 2014) | 28 |
| *Brown v. Chertoff*, 563 F. Supp. 2d 1372 (S.D. Ga. 2008) | 33 |
| *Burgess v. Brown*, 466 Fed. Appx. 272; 2012 U.S. App. LEXIS 3300 (4th Cir. Feb. 7, 2012) | 25 |
| *Caban v. Met Labs., Inc.,* 2019 U.S. Dist. LEXIS 83280 (D. Md. May 15, 2019) | 28 |
| *Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994) | 24 |
| *Chen v. Royal Garden Adult Med. Daycare Ctr. Inc.*, 2018 U.S. Dist. LEXIS 205916 (D. Md. Dec.6, 2018) | 38 |
| *Dennis v. Columbia Colleton Med. Ctr.*, Inc., 290 F.3d 639 (4th Cir. 2002) | 29, 33, 37, 38 |
| *Diaz v. City of Inkster*, 2006 U.S. Dist. LEXIS 53456 (E.D. Mich. Aug. 2, 2006) | 30 |
| *EEOC v. Dimensions Healthcare Sys.*, 2016 U.S. Dist. LEXIS 118775 (D. Md. Sep. 2, 2016) | 38 |
| *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001) | 38, 39 |
| *EEOC v. Texas Instruments*, 100 F. 3d 1173 (5th Cir. 1996) | 30 |
| *EEOC v. Town of Elkton*, 2012 U.S. Dist. LEXIS 98193 (D. Md. July 13, 2012) | 23 |
| *Gatebe v. Bridenstine*, 2018 U.S. Dist. LEXIS 202049 (D. Md. Nov. 29, 2018) | 25 |
| *Geib v. Performance Food Grp., Inc.*, 2016 U.S. Dist. LEXIS 104002 (D. Md. Aug. 8, 2016) | 40 |
| *Glenn-Davis v. City of Oakland*, 2005 U.S. App. LEXIS 4281 (Mar. 15, 2005) (9th Cir. 2005) | 37 |
| *Glunt v. GES Exposition Services*, 123 F. Supp. 2d 847 (D. Md. 2000) | 23 |
| *Gray v. Spilllman*, 925 F.2d 90 (4th Cir. 1991) | 23 |
| *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208 (4th Cir. 2016) | 23, 39 |
| *Gustafson v. Genesco, Inc.,* 320 F. Supp. 3d 1032 (S.D. Iowa 2018) | 41 |
| *Hamilton v. Geitner*, 666 F.3d 1344 (D.C. Cir. 2012) | 36 |
| *Harris v. Mayor of Baltimore,* 2011 U.S. App. LEXIS 9439 (4th Cir. 2011) | 25 |
| *Haynes v. Waste Connections, Inc.*, 922 F.3d 219 (4th Cir. 2019) | 30, 32 |

| | |
|---|---|
| *Hodges v. Federal-Mogul Corp.*, 2015 U.S. App. LEXIS 11765 (4th Cir. July 8, 2015) | 38 |
| *Howerton v. Bd. of Educ.*, 2015 U.S. Dist. LEXIS 109787 (D. Md. Aug. 18, 2015) | 24 |
| *Hudock v. Kent County Bd of Educ.*, 2015 U.S. Dist. LEXIS 31621 (D. Md. Mar. 16, 2015) | 30 |
| *Jackson v. Sebelius*, 2009 U.S. Dist. LEXIS 94084 (D. Md. Oct. 8, 2009) | 24 |
| *Jacobs v. N.C. Admin, Office of the Courts*, 780 F.3d 562 (4th Cir. 2015) | 22 |
| *Jaudon v. Elder Health, Inc.*, 125 F. Supp. 2d 153 (D. Md. 2000) | 39 |
| *Johnson v. City of Charlotte*, 229 F. Supp. 2d 488 (W.D. N.C. 2002) | 30 |
| *Jones v. Western Geophysical Co.*, 669 F.2d 280 (5th Cir. 1982) | 40 |
| *Kronisch v. U.S.*, 150 F.3d 112 (2nd Cir. 2008) | 33 |
| *Langerman v. Thompson*, 155 F. Supp. 2d 490 (D. Md. 2001) | 30 |
| *Lauer v. Schewel Furniture Co.*, 2004 U.S. App. LEXIS 53 (4th Cir. 2004) | 33 |
| *Lockley v. Town of Berwyn Heights*, 2015 U.S. Dist. LEXIS 121215 (D. Md. Sept. 11, 2015) | 30 |
| *McNair v. Computer Data Sys., Inc.* 172 F.3d 863 (4th Cir. 1999) | 40 |
| *Mercantile Peninsula Bank v. French* (In re French), 499 F.3d 345 (4th Cir. 2007) | 22 |
| *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289 (4th Cir. 2010) | 39 |
| *Miles v. Dell, Inc.,* 429 F.3d 480 (4th Cir. 2005) | 39 |
| *Monticciolo v. Grosse Pointe*, 2013 U.S. Dist. LEXIS 69847 (E.D. Mich. May 16, 2013 | 36 |
| *Paoli v. Wilkie,* 2018 U.S. Dist. LEXIS 165767 (N.D. Ill. Sept.26, 2018) | 37 |
| *Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995) | 30 |
| *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) | 22, 25, 30, 38 |
| *Richardson v. City of Hampton*, 1996 U.S. Dist. LEXIS 15437 (E.D. Va. May 30, 1996) | 30 |
| *Rudin v. Lincoln Land Cmty College*, 420 F.3d 712 (7th Cir. 2005*)* | 27 |
| *Saah v. Thumel*, 2017 U.S. Dist. LEXIS 17015 (D. Md. Feb. 7, 2017) | 33 |
| *Schafer v. Maryland*, 555 F. Supp. 2d 572 (D. Md. 2008) | 24 |
| *Scott v. IBM Corp.*, 196 F.R.D. 233 (D. N.J. 2000) | 33 |
| *Shockley v. Minner*, 726 F. Supp. 2d 368 (D. Del. 2010) | 37 |
| *Stennis v. Bowie State Univ.*, 2019 U.S. Dist. LEXIS 59085 (D. Md. Apr. 5, 2019) | 30, 34, 39 |
| *Tolan v. Cotton*, 134 S. Ct. 1861 (2014) | 22, 23 |

| | |
|---|---|
| *Wesley v. Arlington Cnty.*, 2009 U.S. App. LEXIS 26554 (4th Cir. 2009) | 33 |
| *Westmoreland v. TWC Admin. LLC*, 2019 U.S. App. LEXIS 15141 (4th Cir.  May 22, 2019) | 23, 25 |
| *Williams v. Consol. City of Jacksonville*, 2002 U.S. Dist. LEXIS 27066 (M.D. Fla. 2002) | 27 |
| *Wilson v. Phoenix Specialty Mfg. Co.* 513 F.3d 378 (4th Cir. 2008) | 39 |
| *Wright v. Efficient Lighting Sys.*, 2003 U.S. App. LEXIS 8028 (7th Cir. April 25, 2003) | 29 |
| *Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301 (D. Md. 2015) | 40 |

| **Treatises** | **Page** |
|---|---|
| Arthur R. Miller, Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 N.Y.U. L. Rev. 286 (2013) | 22 |
| Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure (3d Ed. 1998) | 22 |
| J. Wigmore, EVIDENCE § 1043 (Chadbourn rev. 1970) | 29 |
| Park & Liminger, The NEW WIGMORE A TREATISE ON EVIDENCE (2018) | 29 |

| **Federal Rules & Regulations** | **Page** |
|---|---|
| Fed. R. Civ. P. 56 Advisory Committee's Note (1963) | 22 |
| Fed. R. Evid. 408 | 37 |

## TABLE OF PLAINTIFF'S EXHIBITS

| DEPOSITIONS | EXHIBIT | | SUBJECT | EXHIBIT |
|---|---|---|---|---|
| Plaintiff - P | 1 | | Response to Interrogatory 1 | 18 |
| Clack | 2 | | Supplemental Response 7 | 19 |
| Claggett | 3 | | Diversity Study page 6 | 20 |
| Fletcher | 4 | | Response to Interrogatory 17 | 21 |
| Ford | 5 | | Response to Interrogatory 25 | 22 |
| Harp | 6 | | Clack's "lack of recall" List | 23 |
| Jones | 7 | | Affidavit of Stacy Scardina | 24 |
| McCarren | 8 | | Affidavit of Plaintiff | 25 |
| Nutting | 9 | | | |
| Perricone | 10 | | | |
| Ross | 11 | | | |
| Ryer | 12 | | | |
| Segal | 13 | | | |
| Shiloh | 14 | | | |
| Stokes | 15 | | | |
| Talley | 16 | | | |
| Wood | 17 | | | |

The Baltimore City Fire Department ("BCFD"): (a) discriminated against Plaintiff because of race by not promoting him to a Battalion Chief position in May 2013 and (b) thereafter, retaliated against him in promotion denials subsequent to May 2013 and stopping his Battalion Chief "acting pay". (Complaint, ECF 1). The BCFD is part of the Defendant Mayor & City Council of Baltimore ("City"). (DMem. at 5).

## I. UNDISPUTED FACTS - SUMMARY[1]

**1.**   Plaintiff is Caucasian and a 20+ year veteran of the Baltimore City Fire Department ("BCFD"), with the rank of Captain, Emergency Medical Service ("EMS"), Emergency Medicine Technician – Paramedic ("EMT-P").

### A.   MAY 2013 PROMOTION DENIAL

**2.**   Despite being ranked #1 on the Battalion Chief EMS-EMT[2] promotion list, effective for two years, Plaintiff was denied a promotion to the BC position on and after May 13, 2013. (Clack 104-105). The firefighter ranked #2 on the promotion list was also Caucasian, named W. McCarren, who too was denied a BC promotion in May 2013. (McCarren 7-10).

**3.**   Two African Americans, T. Claggett and S. Stokes, received the promotions to the two newly created BC positions in May 2013, based off a promotion list that was in effect for a two-year period, from midnight May 13, 2011 to midnight between May 12 and May 13, 2013. (McCarren 10) (Stokes 35-36) (Claggett 32) (Talley dep. 74-79, ex. 7, 8, 9) (Ross 56-57, ex. 6).

**4.**   The two BC positions into which Claggett and Stokes were promoted did not exist on May 13th and were not created, approved or funded by the City's Board of Estimates ("BoE") until May 15, 2013. (Talley 104-107, ex. 14, 15).

**5.**   Claggett and Stokes learned on May 9, 2013, that the BoE would not create, approve and fund the two new BC positions until after the 2011 promotion list expired on midnight May 13th. (Claggett 34-35) (Stokes 52). On May 10th, Claggett and Stokes sent emails to the Mayor's Office, all City Council members and

---

[1] All record cites in this "Undisputed Facts" section acts are from the City's discovery responses or the deposition testimony of its officials. There are no cites to Plaintiff's deposition or discovery responses.

[2] Unless otherwise stated, the Battalion Chief EMS-EMT-P position is referred to as the "BC" position.

staff members, and various other City officials, pushing for their promotions because of their race. (Claggett 53-61, ex. 5, 6) (Stokes 52, 58-60, ex. 5, 7) Claggett and Stokes were promoted by Chief Clack three days after they sent their emails. (*Id*.)

### B.   June 26, 2013 Promotion Denial

**6.**   On June 26, 2013, the BoE, upon the required written request of the BCFD, approved the creation and funding of a third new BC position. (Clack 49-53, ex. 4) (Segal 81-82, ex 17).

**7.**   L. Carter, an African American, who was then a Deputy Chief, was given the choice of demoting into the BC position or being forced into retirement. (Clack 35, 52-53). Carter had been underperforming in his job. (Clack 53-57). Carter chose to demote into the new Battalion Chief position, on July 3, 2013. (Segal 15-17, 80-83, ex. 2) (Perricone 40-41, ex. 6). Carter had sued the City, in December 2011, claiming that race discrimination. (Fletcher 29-30, ex. 1) (Clack 34-36).

**8.**   If Carter not been allowed to demote and instead been "retired", Plaintiff would have been placed in this BC position because he was #1 on current and effective promotion list. (Fletcher 25-26).

### C.   November 2013 To February 2014 – Acting BC Pay & Third New BC Position Vacant

**9.**   Carter worked in the third new BC position for less than five days and then took months of accrued leave before being "retired" in January 2014. (Fletcher 20, 46-47) (Perricone 19-21).

**10.**   In November 2013, Deputy Chief Fletcher asked Plaintiff to fill-in the BC position and perform the function assigned to Carter. (Fletcher 36-38, 41). In this position and performing this function, Plaintiff received pay as an acting BC from November 2013 to February 12, 2014. (Fletcher 36-37).

**11.**   The BCFD stopped Plaintiff's acting out-of-title pay on February 12, 2014, claiming that there was a mistake and that Plaintiff should never have received the pay in the first place. (Segal 80-83).

**12.**   Defendant stopped the acting BC pay within three weeks of Plaintiff filing an EEOC complaint and within a month of his complaint to the BCFD EEO Officer. *See infra* 20.

**13.** The BC position, for which Plaintiff received acting out-of-title pay and which was formerly occupied by Carter, was never filled. The BCFD left it vacant for 15 months and then reclassified it to another position not within EMS. (Ford 34-41, ex. 5) (Segal 56-57, 97-100).

**D.   JANUARY – MARCH 2014 REPORTING OF DISCRIMINATION & EEOC DETERMINATIONS**

**14.** On January 13, 2014, Plaintiff objected to the race discrimination by emailing the BCFD EEO Officer who was also the BCFD HR Business Partner. (Ryer 9, 14; ex 2).

**15.** Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") on January 23, 2014. (Ryer 46-48, ex 4). The EEOC Complaint set forth the basis of his claim as follows:

> From April 26, 2013 to January 15, 2014, I have been denied a promotion into the position of Battalion Chief EMS-EMT-P despite having the highest score and being ranked number one on the promotional list. Two African American employees, Tavon Claggett and Charline Stokes were selected from an expired promotional list. Additionally, a new Battalion Chief EMS-EMT-P position was created as a voluntary demotion for another African American employee, Lloyd Carter. I complained about the discriminatory acts committed against me and requested to have a meeting with the Chief of the Fire Department; my request was denied although my African American peers were allowed the opportunity to meet with him privately. On January 13, 2014, I complained to Bobby Ryer, EEO Officer. On January 15, 2014, I was further denied a promotion when my employer failed to produce an order to promote me to the open and fully-funded position that was vacated by Mr. Carter on January 1, 2014 when he retired.

**16.** On February 24, 2014, Plaintiff emailed the EEO Officer again, stating that he had not heard back from her and asked for a status of her investigation. (Ryer 38-40).

**17.** On March 6, 2014, Plaintiff filed a second EEOC complaint (Ryer 41-52, ex. 5), stating:

> On November 11, 2013, I began working as Acting Battalion Chief EMS-EMT-P and began receiving Acting out of Title pay for this vacant, funded position. On January 23, 2014, I filed EEOC Charge No. 531-2014-00692 in. which I alleged discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended.  On February 13, 2014, Deputy Chief Mark Fletcher advised me that he was ordered to stop paying me Acting out of Title pay for the Battalion Chief EMS EMT-P position despite the fact that I continued to work in this position in an acting capacity.

**18.** More than a year later, on March 30, 2015, the EEOC issued a written Determination in Plaintiff's favor on his first EEOC complaint. (Complaint, ex. 1, ECF 1-2). The EEOC determined that:

> [Plaintiff] ranked number one on the applicable [promotion] list; however, [Defendant] utilized an expired list to promote Captains Claggett and Stokes to the positions of Battalion Chief. Evidence shows the two highest-ranked and eligible individuals for promotion from the active list were both Caucasians. Despite the applicable listing and eligible individuals, Respondent failed to promote these individuals. Rather, Respondent promoted two African-American employees from a list which had expired …

**19.** On March 31, 2015, the EEOC issued a written Determination in Plaintiff's favor on his second EEOC complaint. (*Id*.) The EEOC determined that:

Respondent ceased paying Charging Party acting-out-of-title pay for the performance of MDO duties. Despite Respondent's articulated reason for stopping acting-out-of-title pay to Charging Party, the evidence shows that Respondent's decision occurred within approximately three (3) weeks after Charging Party's filing of his initial Charge of Discrimination. Based on the timing events, the Commission concludes Respondent's a1ticulated nondiscliminato1yreason for stopping payment of acting-out-of-title pay was retaliatory or pretext to hide discrimination based on engagement in a protected activity.

**20.** Pursuant to governing regulations, the EEOC referred Plaintiff's matter to the U.S. Department of Justice. In November 2017, the Department of Justice declined to litigate this case, and Plaintiff was issued a right to sue notice.

### E.   DESTRUCTION OF INTERNAL EEO MATERIALS

**21.** The BCFD EEO Officer maintained an EEO file for Plaintiff, which contained her investigative notes and documented her investigatory actions. (Ryer 25-29).The EEO Officer retired from City employment on March 29, 2019. (Ryer 4). About three weeks before she retired, she shredded all of her EEO file materials. (Ryer 27-29). At the time she shredded her EEO file materials, she was aware that Plaintiff had a pending lawsuit against the BCFD. (Ryer 29-31). In May 2018, the City identified Ryer as a person who personally knew of and "was familiar with the claim of discrimination filed by Plaintiff. (Response to Interrogatory 1, EXHIBIT 18).

**22.** Ryer's EEO file materials contained recordings and/or notes she had of witness interviews and her decision if Plaintiff had a "founded or unfounded claim. (Ryer 26-29). The EEO Officer also maintained an "Outlook Calendar" of all her meetings, which identified any meetings with Plaintiff or about the Plaintiff's internal EEO complaint. (Ryer 22-25).

**23.** No one from the City ever asked EEO Officer Ryer for the EEO file materials she had for Plaintiff or for her calendar entries. (Ryer 23-24).

### F.   GOVERNING EMPLOYMENT POLICIES

**24.** The Administrative Manual of Baltimore City ("the AM") sets forth specific and detailed personnel policies applicable to agencies and departments. (Talley 14-15, 24-26, ex.3, AM-002-1) (Ross 24-25). The AM's stated purpose and scope is:

The Administrative Manual (AM) communicates official City policies and procedures that affect the City's operations and its employees. By distilling provisions of the City Charter, Board of Estimates policies and rules, Memoranda of Understanding and the decisions and directives of the City Administration, the published policies provide uniform and consistent operating rules. The AM includes only those policies and procedures applicable on a citywide basis. Policies and/or procedures that are developed by individual departments and agencies for their own use are not included in the AM. If an agency is exempt from the provisions of certain policies and procedures, it will not be cited in the AM. (*Id.*)

**25.** Compliance with the AM is mandatory (Ross 24-27), and any deviation from its provisions must be reported to the Bureau of the Budget & Management Research: "Employees at all levels of the City government are responsible for ensuring compliance with the provisions of the Administrative Manual. Each city agency head must inform BBMR of any changes in their operations that affect an existing AM policy and/or policy section." (AM-002-1, Talley 24-26.).

**26.**  The Fire Chief is ultimately responsible for ensuring compliance with the AM. (Ross 24-27). The BCFD never exempted itself from any AM policy. (Ryer 130-31).

**27.**  The AM mandates that a City Agency submit a written request to the Board of Estimates to approve or disapprove of specific personnel actions, including the creation of new positions. (AM 101-1, Talley 30-33, ex. 3) (Ross 29-31). The AM dictates that a City Agency cannot take any action on a requested personnel action until the Agency gets written approval back from the BoE, which is normally within five days. (AM 101-1, Talley 34-36, ex. 3) (Nutting 66).

**28.**  The creation of the three new BC positions in May and June 2013 required written approvals from the BoE. (AM 101-1, Talley 34-36, ex. 3)

**29.**  The AM applies with full force and effect to the BCFD, unless the AM conflicts with the labor agreement, known as the Memorandum of Understanding ("MOU"), between the BCFD and the firefighters' Union. (Ross 27) (Ryer 122) (Nutting 59-60).

**30.**  The MOU provides that promotion lists are in effect for two years and that promotions must be based off the current promotion list in ranked order. (Talley 64-66, 101, ex. 6) (Nutting 71). Promotions are required to be based on this totally objective sole criterion. (*Id.*) (Nutting 85-86). "The Eligibles List is valid for a period of two years. When a Battalion Chief vacancy occurs, the name next on the promotional

list is selected to fill that position. The Department follows the "Rule of One', which means that the Fire Chief lacks any discretion to select candidates for promotion from the Eligibles List." (DMem. 5).

**31.** The AM's authority flows from the City's Civil Service Commission. AM Section 201-1 sates that the "Civil Service Commission makes rules to accomplish proper personnel administration". (Talley 58-60). The Civil Service Commission makes the Rules, and the City Department of Human Resources ("DHR") makes the policies in the AM for administering the Rules. *Id.* The City's Civil Service Commission Rules applied to the BCFD. (Talley 59, ex. 5) (Nutting 71-72, ex. 17 at 115-19).

**32.** The BCFD Manual of Procedure sets forth policies specific to the BCFD. (Nutting 46) (Segal 26, 34-35, ex. 6). The very first sentence of MOP 355 states that "[i]t is Baltimore City Fire Department policy to fill vacancies via promotions when, but not before, those vacancies exist." (Segal 35, ex. 6).

### G. THE CITY'S STATED DESIRE TO INCREASE DIVERSITY WITHIN BC RANKS

**33.** The Mayor of Baltimore and the Fire Chief had the stated desire and objective of making the BCFD "look more like the City of Baltimore as far as race." (Clack 36-37). Within the BCFD, there were regular discussions about increasing diversity, and there was un "undercurrent of race" in everything the Fire Chief did. (Clack 33-34). Race regularly was discussed in connection with promotions in 2013. (Clack 46).

**34.** In 2012, a City study by an outside national employment law firm determined that African Americans were greatly underrepresented in the BC ranks.[3]

## II.   GENUINE DISPUTES OF MATERIAL FACT

### A. MAY 13, 2013 PROMOTION DENIAL BECAUSE OF RACE

#### 1. Race Facts – Background

Chief Clack started with the BCFD in June 2008, after resigning as Fire Chief for Minneapolis, Minnesota. (Clack 11). Chief Clack hired a Minneapolis Human Resource officer, Steven Nutting, to be his Chief of Staff. (Nutting 6-7).

---

[3] *See* City's Supplemental Response to Production Request 7 at 2 (EXHIBIT 19).

As Chief, Clack was allowed to appoint persons to his command staff, including assistant chiefs deputy chiefs, and commanders. (Clack 37-38) (Claggett 25-25). In around 2010, Clack promoted, by appointment, a captain, M. Fletcher (Caucasian) to a Battalion Commander staff position. (Fletcher 32-33).[4] In doing so, Clack passed over several African Americans whom were on promotions lists; Fletcher was not on a promotion list. (Claggett 23, 85). Claggett was one of the African Americans passed over. (*Id*.) In 2011, Clack promoted Fletcher again, this time to Deputy Chief. (Fletcher 8, 33).

Around this same time, Clack removed an African American Carter from his Deputy Chief position as head of the Firefighters Academy, and put Fletcher in charge of the Academy, and moved Carter to a. position in Community Outreach, a new program intended to increase minority representation in the BCFD. (Perricone 44-45) (Fletcher 22-23). Clack's removal of Carter came after reports that African American recruits were being provided with preferential treatment and not held to the same academic, attendance and performance standards as Caucasians. (Fletcher 35).

Carter filed an EEOC Charge claiming race discrimination and, several months later, in December 2011, filed a federal court lawsuit, alleging race discrimination with respect to promotions and other terms and conditions of employment, and naming the City, the BCFD and Chief Clack as defendants. (Fletcher 30-31, ex.1) (Clack 35-37).[5]

As a result of the Carter lawsuit, in 2012, the Mayor's Office commissioned the national employment law firm of Jackson, Lewis. P.C., to address any "legal liability … as a result of the alleged discriminatory practices". (ECF 34, Court Order on discovery dispute). In addition, the Mayor's Office had the lawyers do a "diversity study", which showed that minorities were least represented in the BC position. (*Id*. and page 6 of the study, attached as EXHIBIT 20.)[6]

---

[4] Clack claimed he could not "recall" if he ever promoted Fletcher. (Clack 33).

[5] Clack claimed he could not "recall" if he ever spoke to anyone from the Mayor's office or the City Council about Carter's lawsuit or with a representative from the Vulcan Blazers (fraternal organization representing more than 300 full-time minority professional fire fighters and paramedics) about the Carter lawsuit, but he thinks that maybe he may have. (Clack 34-36).

[6] Clack claimed that he was not aware of the study, even though the City expressly stated that the findings of the study had been shared with him. *See* Defendant's supplemental response to Production Request 7, attached as EXHIBIT 19.

Clack openly acknowledged that as Chief "there's an undercurrent of race in everything" he did. (Clack 33). His Chief of Staff agreed with that characterization. (Nutting 100-101).

The Mayor, who Clack worked for, wanted to increase racial diversity in the BCFD. (Clack 37-38). Further, race also came up at least "occasionally" with his command officers in discussions Clack had about promotions. (Clack 46).

On January 30, 2013, Clack met alone with Claggett. Claggett told Clack that Claggett deserved a promotion to BC before the expiration of the 2011 list in a few months. [7] (Claggett 19-25). Claggett raised the issue of Clack's promotion of Fletcher, the Caucasian who was promoted to a fire command staff position over him.

On the very next day, January 31st, Chief Clack emailed Assistant Chief Segal advising that Clack wanted to create two new BC positions so that the position-holders could "float" in the field and "to better manage EMS." (Clack 132-34, ex. 29). Clack also emailed Deputy Mayor Maloney, asking for his support of this personnel action, and Clack specifically referred to Claggett and Stokes as the persons next in line to be promoted into the two new BC positions. (Clack 78-80, ex. 29).

*One of the very few specific subjects* that Clack recalled during his deposition was that the two new BC positions were **not** created for any specific person. (Clack 64, 83, 86-87). He stated firmly that the BCFD had a very real and strong need to have more EMS BCs and that the Mayor's "Citi-Stat" program was demanding that EMS services become more efficient. (Clack 64, 130-31). He was required to promote whoever was on the top of the BC promotion list when the positions were available and that he had no discretion as who to promote. (Clack 20-21, 127-29).

On February 19, 2013, the BCFD issued a bulletin, announcing a BC promotion examination, with applications due no later than March 8, 2013. (Clack 63-64, ex. 7) (Nutting 79-80, ex. 21). The two-day exam. was set for the last week in April 2013. (Claggett 53-54, ex. 5). Claggett chose not to apply because

---

[7] Clack claimed to have absolutely no recollection of this conversation. (Clack 64).

he was on vacation. (Claggett 43-45). Stokes applied but did not sit for the test because she claimed to be in the hospital for an appendix rupture. (Stokes 37)[8]. Stokes sued the BCFD in the 1980's, claiming race and gender discrimination. (Stokes 80).

All the persons who sat for the promotion exam. were Caucasians. (P 76-77).

The results from the April 2013 BC exam. were published on May 13th, the day that the promotional list became effective. (Nutting 50-51). Plaintiff was ranked #1 on this list and McCarren #2. (*Id*.). Plaintiff was issued formal notification of his #1 ranking on the morning of May 13th. (P 274-76, ex. 12).

### 2.   The April to pre-May 8, 2013 Race-Motivated Push To Promote Claggett And Stokes

Even though Plaintiff was ranked #1 on the May 13th BC promotion list, Defendant failed to promote Plaintiff to BC when the BoE first approved and authorized the BC positions two days later on May 15th. The BCFD claimed that an "administrative oversight" caused the BoE not to approve the BC positions at its meeting, a week earlier on May 8, 2013. Chief Clack, Assistant Chief Segal, Chief of Staff Nutting, and the BCFD HR representative had no personal knowledge of, and could not explain, the claimed oversight (Clack 24-25) (Segal 18) (Nutting 102-103) (Ryer 138-39).

The facts establish that, to the extent there was any oversight, it was because the BCFD had tried to push through the BC promotions of Claggett and Stokes because of their race.

In 2013, the BoE permitted only one meeting per month to address personnel requests, which was set on the fourth Wednesday of every month. (Talley 99-101, ex. 12) (Nutting 86-89, ex. 12, 13). In May 2013, the date was May 22, 2013. (*Id*.). The published BoE schedule was well-known and disseminated to all City agencies. (Ross 69-71). Agencies were expected and directed to comply with the schedule. (*Id*.).

Rather than complying with that schedule, the BCFD sought BoE approval for the creation and funding of the two new BC positions at the May 8th, a non-personnel request Board meeting, and the soonest

---

[8] Stokes' clear understanding was that Clack had created the BC positions specifically for Claggett and her. (Stokes 26-29, 37).

Board meeting before the expiration of the 2011 BC promotion list. This race-motivated push is evidenced by the following facts:

> ➢ The BCFD, without explanation, failed to comply with the AM rules for first obtaining the written approval of the City's Department of Human Resources, the Bureau of Management & Budget Research, the City Labor Commissioner, and Expenditure Control Committee, before seeking BoE approval for the funding and creations of new position. (AM 101-1, 230-1, 230-3; Talley 34-36, ex. 3, Nutting 66). According to the set schedule, this was at least a four to five-week process. (Nutting ex. 13).

> ➢ Instead of obtaining the written approval of the various City components, the BCFD used a "telephone poll request form" (used only for "rushed matters"), and only started that process, at the earliest, on "April 26, 2019"[9], less than two weeks before the May 8, 2013 BoE meeting. (Nutting 86-89, ex. 25) (Talley 102-103, ex 14).

> ➢ The "telephone poll" form shows that the City Labor Commissioner neither approved nor disapproved the personnel request (*Id*.). The BCFD still proceeded to present the request to the Board of Estimates.

> ➢ Under the MOU, Article 19, the BCFD was required to provide the Union with at least 15 days' notice before it created and/or abolished Union positions. (Nutting 82-83, ex. 23). Only on April 25, 2013 did the BCFD provide the Union with the notice that it was going to start the process for creating two new BC positions. (*Id*.) Fifteen days after April 25th was May 10th, two days after the BoE meeting on May 8th. (Clack 66-71, ex. 9). To try get BoE approval on May 8th, before the 2011 promotional list expired, the BCFD had to ask the Union to waive the 15-day rule. (Clack 66-71) (Nutting 82-83).

> ➢ The BCFD attorney actually prepared the letter signed by a Union official, agreeing to waive the 15-day rule. (Clack 70-71, ex. 10). No one from the BCFD or the Union recalled any other time when City had ever asked the Union to waive the 15-day rule (Clack 66-71) (Nutting 82-83) (Jones 10-11) (Response to Interrogatory 17, ==EXHIBIT 21==).

**3.** **May 9 To May 13, 2013 Facts**

On May 9th, after learning that the BoE did not approve the two new BC positions, Claggett and Stokes met with the Union President (Claggett 34-35). Claggett and Stokes were told that "it didn't look good" for them because BoE did not approve the positions on May 8th. (*Id*.)

---

[9] This "April 26" date, hand-written on the form by Chief of Staff is highly suspect, because the BCFD "personnel request form" for the approval of the two new BC positions was not dated until three days later on April 29, 2013. Chief of Staff Nutting, who initiated the personnel request form, was not able to explain how the telephone poll request could be started before the written request for the action was ever made. (Nutting 89-90).

At 8:43 a.m. on Friday morning, May 10, 2013, Claggett emailed Deputy Mayor Robert Maloney with the subject line: "Urgent Matter - EMS Battalion Chief Promotions". (Claggett 53-61, ex. 5, 6)[10]. The email made a direct appeal that Claggett and Stokes be promoted on account of their race. In pertinent part, the email stated:

> The sense of urgency that I am speaking of is relative to the current list expiring on Monday May 13th there are two African American's [sic] (myself and Capt. Stokes sitting at the top of the list. We are in the exact same situation that we were in two-years ago, in that we both died one and two on that list. Also, there was a recent BC EMS exam administered the week of April 27th and neither one of us were able to sit for the test due to personal matters that conflicted with the exam dates. With that being said there are no other African American's [sic] that will be on the list of potential appointees for BCEMS for at least another two years.

> The current state of diversity in the BCFD among the officer ranks and more importantly the Chief level and above is severely lacking. Currently out of 32 Battalion Chiefs, there is only 1-African American, and I feel that this is an opportunity for the F.D. to take full advantage of increasing diversity within Chief ranks. Also, this opportunity presents a historic moment for the BCFD, as this she [sic] would be the first African American female Chief Officer in its long-standing history. (Claggett ex. 6).

The Deputy Mayor responded to Claggett within about 30 minutes, stating that he was "looking into the matter." (Claggett ex. 5).

At 5:45 a.m. on Friday May 10th, Stokes emailed all City Council members and some of their staff, with the subject heading: "I need God and you to help us today". (Stokes 52-58, ex 6). Like Claggett , Stokes urged that the promotions be based on race. She stated, in part:

> Fire Chief James Clack had decided to create two positions in February 2013 in the Baltimore City Fire Department under Battalion Chief Emergency Medical Services. …

> Our current Battalion Chief of Emergency Medical Services list will expire on Monday May 13, 2013. Is their [sic] anything that you can do today to support this. This will truly be a missed opportunity.

> Currently we have 34 Battalion Chiefs in our Department, out of 34 only one is African American. (*Id.*).

Stokes sent similar emails to various other City agencies/officials. (Stokes 52, 58-60, ex. 5, 7).

Within a few hours after Stokes and Claggett sent their emails, an aide to Chief Clack called Stokes and told her that Clack wanted to meet with Claggett and her on Monday, May 13th. (Stokes 26-27).

Stokes and Claggett met with Clack on May 13th, and Clack told them: "I am promoting you today. I am backdating the Order to May the 8th"(Stokes 38-39), "I'm promoting you today". (Claggett 17-20). Both

---

[10] This is the same City Official who Chief Clack emailed months earlier to advise that Clack wanted to create two new BC positions, the day after Clack met with Claggett. *See supra* 8.

testified that before Clack spoke, Claggett presented Clack with an agenda, which Clack looked at before speaking. (*Id.*) Of the four stated "issues/concerns" on the agenda, one was stated as "Lack of Diversity" and another was "Long-Term Lack of Diversity in EMS Leadership". (Claggett ex. 2). Race was clearly at play in the promotion discussions and decision.

Chief Clack incredibly claimed that he had absolutely no recollection of meeting Claggett and/or Stokes on May 13, 2013 or at any time around then. (Clack 86-88, 99-100).

Clack testified that it was possible the City Council members and/or the Mayor's office contacted him between the time when Claggett and Stokes sent their emails and May 13th, when he promoted them. (Clack 93-94). He again claimed absolute and total lack of recollection.

Clack spoke to the Union between May 8th and May 13th and race may very well have been discussed as a factor whether to promote off the 2011 expired list (Clack 104-105).

Clack admitted that the May 13th promotion list, became effective on midnight at the end of May 12th and the beginning of May 13th. (Clack 72-73, ex. 11).

Clack may have known that he was resigning when he decided to promote Claggett and Stokes. (Clack 29-30). Clack announced his resignation for "personal reasons" in June 2013 and left the BCFD shortly after that. (Clack. 14-16). Clack did not have another job until sometime in 2014 when he became Chief of the fire department in Ankeny, Iowa. (Clack 12).[11]

EMS Battalion Chief Shiloh, a 12-year BC, testified that Clack's decision to promote Claggett and Stokes to BC was because of race. (Shiloh 12-13). BC Shiloh knew that the 2011 list had expired. (Shiloh 9-11).

EMS Battalion Chief Harp, a 10-year BC, testified that Clack's decision to promote Claggett and Stokes to BC was because of race. (Harp17-18). BC Harp knew that the 2011 list had expired. (Harp 9, 16-17).

---

[11] Deputy Chief Perricone, who worked under Clack for several years, testified that Clack was "ridden out on [a] rail" by City officials. (Perricone 4-5).

Fletcher, who worked directly under Clack as his Deputy Chief for more than two years, testified that Clack had promoted Claggett and Stokes from an expired list and that Plaintiff, instead, should have been promoted based on governing rules. (Fletcher 6, 36-37). Fletcher said that there was a lot of "negative feedback" and "a lot of negativity" as a result of the racial issues in the BCFD. (*Id.*).

On May 26, 2013, Plaintiff presented his first step grievance to management official BC Shiloh, with the Union Vice President (a 28-year BCFD employee and 20-year lieutenant) present, and specifically identified race as the reason he was not promoted. The Union official added that the Union was "afraid of the race issue" if Claggett and Stokes were not promoted. (Shiloh 8: "He said they're worried about or they're afraid of the race issue.") (P 38, 145-47, 270-71).

**4.   Misuse Of, And Noncompliance With, Rules To Cover-Up The Discrimination**

**a.   The 2011 List Expired At Midnight Between May 12 and 13, 2013.**

Initially, the BCFD wanted Plaintiff to believe that the 2011 list was good through the entire day of May 13, 2013, when Chief Clack made and announced the promotions of Claggett and Stokes.

On May 15th, Plaintiff, through his Union, sent an email to BFCD HR Business Partner Ryer and DHR Deputy Director Talley, asking whether the May 13, 2011 promotion list expired at midnight May 13th (between May 12th and 13th), or at the end of the day on May 13th. (Talley 65-69, ex.7, 8). City DHR and BCFD HR officials debated internally for weeks how to respond to the question, via email and oral communications. (Talley dep. 74-79, ex. 7, 8, 9). The BCFD never responded directly to the inquiry, but the City DHR did finally, nearly a month later, on June 13, 2013. DHR stated that the 2011 list expired on midnight between May 12th and 13th, and the 2013 list became effective and governing at 12:00:01 a.m. on May 13th. (Talley 83, 101, ex. 11) (Ross 56-57, ex. 6).

**b.   The Civil Service Commission Rules Did Not Permit The BCFD Action.**

Six days later, on June 19, 2013, after acknowledging that that 2011 list had expired when Chief Clack made the promotions, City, by email, then claimed that the BCFD could still promote off the expired 2011 list (Ross 66-69, ex. 9) alleging:

However, there are some other wrinkles here. Eligibility lists are certified to the agencies upon request. Once an eligibly list has been certified to an agency, they have 60 days to make a selection. Those selections are valid if they are returned to DHR prior to they are returned to DHR prior to the 60-day window the agency has the list. The last selections from the 2011 EMC BC list were made in and DHR received notification on May 8, 2013.

The BCFD had never before used this excuse, and, the City failed to identify any specific rule or policy that supported this new argument. Years later, in responses to interrogatories, Defendant claimed that the authority for its action was in the Civil Service Commission Rules. (Response to Interrogatory 10, Perricone ex. 12). However, again the City provided a false justification. The Civil Service Commission Rules require that a "vacancy" must actually exist before a promotion can occur <u>or</u> any action to promote into the vacant position can be taken. Rules 29 and 33 are the relevant Rules, (Talley 59) (Nutting 72-74, ex. 17), which state, in pertinent part:

> <u>Rule 29. Certification for Positions in the General Category</u>
> **Whenever a vacancy occurs** in any position in the General Category, the appointing officer shall make written request to the Department [of Human Resources], upon the form prescribed by the Department, for certification of eligibles …
>
> E. <u>Actions by Appointing Officers</u>
> Upon receipt of the certification, the appointing officer [can take appropriate action] …
>
> … The appointing officer may within sixty days (60) days after certification, appoint one of the persons whose names have been certified is willing to accept the appointment … . (emphasis added).
>
> <u>Rule 33. Records of Appointment</u>
> When a person whose name has been certified to an appointing officer as one of the eligibles for appointment to a **vacancy**, has been appointed to such **vacancy**, the appointing officer shall report such appointment to the Department [of Human Resources] on the form prescribed by the Department, within two days after the appointment has been made. …

Chief of Staff Nutting testified that the Rules' term "vacancy" means "when an approved position within a department has no employee in the position, the department can request the Department of Human Resources to fill that position from." (Nutting 73).

### c.  No "In Lieu Of" Policy Or Practice Permitted The BCFD Action.

Within seven minutes of getting the City's email about its new excuse for its action, Plaintiff, through his Union, responded, by email, to the obvious fatal flaw in the City's new argument – there was no BC vacancy until May 15, 2013. (Ross 67-68, ex. 9).

The City took six days to respond. Finally, on June 19, 2013, the City came up with yet another new

confounding argument (Ross 65-70, ex. 9), which was:

> The two (2) newly created positions of Battalion Chief EMS had been approved by DHR and were scheduled to go to the Board of Estimates for final approval on May 8, 2013. However, due to an administrative oversight, BOE approval for the new position was not received until May 15, 2013.

> On May 8, 2013, to redress the administrative oversight, two (2) current, eligible fire department employees [Officers Stokes and Claggett] were promoted into two (2) existing vacant positions (one (1) of which is an Executive Level I and the other Fire Command Staff II) in lieu-of receiving transfers to the newly created position of the Battalion Chief EMS. On May 15, 2013, after procuring BofE approval for the newly created positions, the two (2) current, eligible fire department employees were transferred from the in-lieu of capacity to the newly created position of BC EMS. This type of temporary in-lieu of placement pending an available position, which requires DHR's authorization, while not common, is also not without precedent.

> This temporary in-lieu placement pending an available position, which requires DHR's authorization, while not common, is also not without precedent.

This was the first time that the City claimed that there had been an "administrative oversight" and that the BCFD had used a in lieu of "placement" on May 8, 2013 as a way to promote Claggett and Stokes before the BoE action on May 15, 2013.

There was no "in lieu of" policy or practice that permitted the BCFD action. There was no "in lieu of" rule within the Civil Service Commission Rules, and the term is never even used, in the MOU or MOP.

Only the AM contains a "in lieu of" provision which appears in the "transfer" section. The AM contains a detailed "transfer" policy in Section 231-1, which states unequivocally that "[t]his Policy does **not** apply to promotions." (emphasis in original) (Talley 45-46, ex. 3) (Ross 39-41). "A City Agency must not use the transfer policy as a device to promote someone to a higher position." (*Id*).

The AM defines a "transfer" as "the filling of a vacant position with a City employee whose job class is the **same** as that of the **vacant** position (or related and carrying a lower salary than that of the **vacant** position)" (emphasis added). (Talley. 45-46, ex. 3). A vacancy is a prerequisite for a transfer.

> ➢ *The BC position was not in the same series as either the Fire Command Staff position or the* <u>*Executive Level position.*</u>

The AM's transfer "in lieu of" provision states:

> An agency may fill a vacant position with an employee whose job class is not the same as the class of the vacant position if such action will allow the individual to gain the necessary experience to qualify for the class. **To be eligible, the employee's class and the class of the vacant position must be in the same class series.** (For example, a Senior Clerk position may be filled with a Clerk "in lieu of" a Senior Clerk.) (emphasis added). (Talley 46-49, ex. 3).

15

The AM identifies positions within the City by "class series". (AM-291-1,-2; Talley 38-41, ex. 3). A class series is "a position that may have several different tiers or layers". (Talley 38). For example, "there could be a human specialist 1, 2, 3, 4 and so on". (*Id*.). "There are several job classifications in the City of Baltimore that have a series." (*Id*.)

The BC position does not have a series The Executive Level position has a class series "I, II and III", just like the Fire Command position. (AM 291-2; Talley 41-43, ex 3).

The BC position, with certainty, is not in the same class series with either the Executive Level position or the Fire Command position. (*Id*.) (Talley 137-38)[12]. Therefore, Claggett could not have been transferred to the Executive Level I position in lieu of the BC position; and Stokes could not have been transferred to the Fire Command Staff II position in lieu of the BC position. Claggett testified that no one ever told him he was serving as an Executive Level I fire command officer in lieu of a BC position. (Claggett 49). The same was true for Stokes; no one told her she was serving in a Fire Command II position in lieu of a BC position. (Stokes 27, 54).

> ➢ *The BCFD did not obtain DHR's required authorization for the claimed "in lieu ofs".*

The BCFD did not obtain the DHR's authorization for the "in lieu of", as required. (Ross 65-70, ex. 9). DHR HR Specialist Ross testified that the BCFD was required to submit a written request in a "memo" form for approval from DHR before doing the claimed "in lieu of transfers" for Claggett and Stokes. (Ross 70).

DHR did not approve the action because the "horse was already out of the barn". (Talley 91, 132). The BCFD, after-the-fact, created the "in lieu of" excuse in an attempt to justify and hide its discriminatory conduct.

> ➢ *The BCFD never before had used the "in lieu of" in a similar situation.*

The BCFD never before used an "in lieu of" "placement to effectuate a promotion from an expiring list into a position not yet existing. The BCFD HR Business Partner had no knowledge of any such action. (Ryer

---

[12] The Fire Command and Executive Level positions are appointed Fire Command positions and not Union positions.

122-24, ex 9). The City Deputy Director of DHR said the same.(Talley 84-86, 92, ex 10). Clack's Chief of

Staff did not even know if the BCFD used "in lieu of" for Claggett and Stokes. (Nutting 99-100). Chief Segal

testified that he had no knowledge of any in lieu of process ever used as a way to promote. (Segal dep. 40-41,

ex. 7). Chief Segal never used or authorized such action. (Segal 41-43).

    **d.**  **BCFD Intentionally Ignored The Governing Promotion Policies.**

AM Section 235-1 defines a promotion as "a movement by the employee from an existing position to

a vacant and funded position of a higher classification" and includes when "[a] vacant position is available

and funded in a class and grade higher than that in which the employee is currently filling." (Talley 49-53,

ex. 3). "A promotion may not occur without funding." (*Id.*).

DHR Deputy Director Talley testified that the BCFD was not permitted or authorized to make the BC

promotions until after the BoE approved the creation and funding for the two new positions. She testified

that no one should have been placed into the Battalion Chief positions until after the May 15, 2013 BoE

approval of the request for the creations of those positions. (Talley 112). Clack admitted that he knew of

no other occasion when someone was placed into a position that had not yet existed and not yet been funded

by the BoE. (Clack 108, 115-16).

    **5.**  **The BCFD Claimed Use Of The "In Lieu Of" Policy Is Itself Not Credible.**

There is ample evidence that the BCFD actually never even used an "in lieu of" process, and simply

fabricated that it did – all to try to hide the discrimination.

Chief Clack could not recall who specifically told him that he could use a "in lieu of" process,

retroactively, on May 13, 2013, to place Claggett and Stokes, on paper, into another position from May 8th

and then hold them in that position until the BoE approved the creation of the two new BC positions on

May 15th. (Clack 24, 101-102). At different times, he speculated that Chief of Staff Nutting, HR Business

Partner Ryer, or someone from else from City DHR had told him. (*Id.*).

Chief of Staff Nutting had no recollection of having any conversation or communication with Clack

about using "in lieu of" to get Claggett and Stokes placed into the BC position. (Nutting 94-99). HR

Business Partner Office Ryer testified that she never spoke to Clack about the process. (Ryer 136). City DHR Deputy Director Talley and City DHR HR Specialist Ross both testified that they never had any communications with anyone from BCFD about using "in lieu of" as a way to get Claggett and Stokes into the BC position. HR Deputy Director Talley never would have told Clack to "misapply" the policy and stated that the BCFD made the decision without consulting with City DHR. (Talley 81-82, 91, 132). DHR HR Specialist Ross would never have had a conversation with Clack because she had no involvement for "in lieu of" actions for the BCFD. (Ross 66-67).

Equally important, there was no Fire Command Staff II position even vacant to have "in lieu'd" of Stokes there. (Ryer 97-98) (Woods 62-69). There was no position to place her in.

## B.   JUNE 26, 2013 PROMOTION DENIAL BECAUSE OF RACE

Carter was the third African American that the BCFD placed into a new BC position within a seven-week period. This occurred on June 26, 2013, when the BoE, at the proper meeting for actions on personnel requests, approved and funded the new BC position. (*supra* 2).

Rather than promoting Plaintiff to the new BC position, Clack allowed Carter to demote into the position. (Clack 52-53). There was no requirement that Clack provide Carter with the option of demoting into the position. (Clack 52-54).

Carter had very serious performance deficiencies. (Clack 56-57) (Nutting 15-17). Plaintiff had none; Plaintiff's performance was "exemplary". (Fletcher 56-57) (Harp 7) (Shiloh 13).[13]

Clack chose not to promote Plaintiff. (P 162-63). Clack was focused on getting more minorities in the BC position and had recently been sued by Carter for race discrimination. Plaintiff was a better employee by all objective measures. Clack chose Carter because of race.

---

[13] The performance endorsements from Plaintiff's superiors speak far louder than the City's self-serving claim that Plaintiff was not an "exemplary" employee. (DMem. 1-2). The City also leaves unanswered that Plaintiff received "kudos" when he was acting BC. (P 267-68, ex. 10). Further, BC promotions are determined solely by exam ranking; hence, performance on that issue is completely irrelevant. Lastly, his evaluations are consistently at the highest level. *See* Exhibit B to DMem. Prior to the discrimination in May 2013, according to the City, Plaintiff received discipline (minor) only twice, eight and ten years previously. *Id.*

### C. FEBRUARY 2014 RETALIATION, STOPPING ACTING BATTALION CHIEF PAY

When Carter was assigned to the BC position, he was designated to perform the function of the Medical Duty Officer ("MDO"). (Perricone 30).

Shortly after Carter started in the BC position, Clack resigned and Segal became the Interim Chief. Segal denied having any knowledge of what Carter did as the new BC. (Segal 57-58, 69-70).

Segal's Deputy Chief, Perricone, testified to the exact opposite. Perricone, who was in charge of EMS at the time, testified that Segal ordered him to assign BC duties to Carter consistent with Carter's demands:

> My conversation with Chief Segal was I had to make up -- I had to find something for him to do because he was allowed to demote to battalion chief EMS. So we had to find something for him to do, and the request was made by Chief Carter to stay on a day work schedule. So that's where we came up with the plan to have him fill in for BCEMS during the day or because we were in an extremely tough battle with City stat, we were going to try to do a pilot project with, it used to be called BMRC. (Perricone 30-31; *see also* 44-45).

Perricone's testimony that the third new BC position to perform the MDO work was needed was fully consistent with the testimony of Clack and Nutting. Chief Clack, although not being able to recall much during his deposition, was firm that there was a clear need for someone to be working in this new BC position. (Clack 162). A new BC position had to be created because EMS needed help in quality control. (Clack 53-59). Nutting agreed, testifying that the BCFD "desperately needed management and staff in EMS". (Nutting 13-14).

The BCFD written request to the BoE for this third new BC position, which Clack approved, stated that the new BC position was needed to reduce overtime and would rotate among the different shifts. (Clack 57-59) (Nutting 13-14, ex. 1).

Carter only worked in the BC position for a few days, and then was absent on leave, using all of his accrued leave until January 2014, when he retired. (Fletcher 20, 46-47) (Perricone 19-21).

When Carter was on leave, Deputy Chief Fletcher selected Plaintiff to act as BC and perform the MDO function, and authorized paying Plaintiff "acting out of title pay" since Plaintiff was filling-in as a higher-

ranked BC position. (Fletcher 36-37).[14] Plaintiff was told that he was filling-in as BC and to also perform the MDO function. (P 258-59).

Plaintiff received acting BC pay from November 2013 to February 12, 2014, when Chief Segal, suddenly ordered that the acting BC pay stop. Segal did not even ask Deputy Chief Fletcher for his input on the decision. (Fletcher 16-19, 39, 48-52) (Segal 85-88). Segal directed Assistant Chief Moore to instruct Fletcher to instruct Plaintiff that the acting pay was stopped immediately. (Segal 99). Segal was the ultimate decider for stopping Plaintiff's acting BC pay. (Segal 71-73).

The BCFD tried to cover-up its retaliation by lying to the EEOC. In its City-lawyer-written EEOC position statement, the BCFD stated that "Deputy Chief Fletcher …, after reviewing the job responsibilities found that the job did not require the skills or abilities of a Battalion Chief." (Segal 85-86, ex 18). Fletcher did no such thing. (Fletcher 16-19, 38-42).

The claim that Plaintiff was not working as at a BC level when he was doing the exact job that was given to BC Carter is absurd. When Plaintiff was acting in the position but not at work, another BC served in the BC position. (Segal 71-72) (Perricone 21-27, 88-89, ex. 2). Under the MOU with the Union, "it's impossible" that a BC would "ever be asked to serve in a lower level" position and "receive acting-out pay in a battalion chief level." (Perricone 21-27). Hence, by rule, Plaintiff was acting as BC when performing the MDO function, just like BC Carter and the other BC that acted for Carter.[15]

Perricone prepared a document, at the direction of his superior, called "Chief Carter's Job Assignment" (Perricone 34-36, ex. 5), months after the acting BC pay stopped, for self-serving use in BCFD grievance process. *See* note on Perricone ex. 5. (*Id.*)[16] The BCFD relies on this after-the-fact-created document to try

---

[14] "In general terms, acting out title means when a person in a lower grade is performing the duties of a grade higher. So with that being said, it's about the position, not the person. … [A]s long as he or she is approved to act in that position, and there's a commensurate pay differential between that person's pay and the person that they're acting in place of." (Perricone 89).

[15] In answers to Interrogatories, Defendant stated that a BC has never acted at a lower level position. (Response to Interrogatory 25, Exhibit 22).

[16] Perricone was not Carter's superior when Carter started in his new BC position, so Perricone did not even know what Carter actually did on the few days that Carter was actually on the job. (*Id.*)

to explain its decision to stop the acting pay. The document lists assuming "EMS field operations" and "writing MDO position and corresponding MOPs" as two job tasks, and the BCFD claims that Plaintiff, while performing all the other required tasks, did not perform those two.[17] This excuse is eviscerated by the following facts:

- there is no contemporaneous prepared document that actually shows the actually job duties required;
- there is no dispute that Carter <u>never</u> performed the two claimed job tasks (Perricone 21-22, 35) (Fletcher 10-11);
- Plaintiff assumed field EMS operations in January 2014 and produced a record showing that he had (P 212-13, 264-65, ex. 9);
- Plaintiff wrote the MDO position and assisted in its writing and of MOPs, and identified at least one MOP he wrote (P 209-211: "There was communications back and forth regarding the MDO position and the MOPs. I gave input and I gave the creation of documents to do research and then participated in the MDO position and corresponding MOPs."); and
- Chief Segal testified that a BC is not required to perform every single listed job function to work as a BC; the person just needs be able to when required (Segal 64-65, 104-105).

**D.   APRIL 2014 RETALIATORY AND DISCRIMINATORY RECLASSIFICATION OF BC POSITION**

About two months after stopping the acting BC pay in February 2014, the BCFD, in April 2014, obtained BoE approval (at the proper personnel request meeting) to reclassify the BC position that Carter held and that Plaintiff filled-in as, to a BC fire suppression position, which automatically disqualified Plaintiff from holding that position. (Ford ex. 4).

In April 2014, N. Ford was the Fire Chief, and Segal remained as Assistant Chief, after serving as Interim Chief. (Ford 39-40) (Segal 97-100). However, Segal was the "driver" for this reclassification (Ford 34-40) (Segal 56-57, 97-100). Segal claimed that the BC EMS position was not needed and was a "waste of assets" because there were already enough BC EMS positions and fire suppression needed the BC position. (Segal 97-100). Former Chief Clack, Chief of Staff Nutting, Deputy Chief Fletcher, and Deputy Chief Perricone testified unequivocally that the third newly created BC EMS position was a needed

---

[17] Plaintiff does not dispute that, at the grievance on the acting pay dispute, he said he did not perform these tasks. Plaintiff explained that he was mistaken and not thinking clearly due to the false claims and fake documents presented by the BCFD. (P 206, 216-17).

position. (*supra* 19).

Despite the BCFD claim that fire suppression needed the BC position, it was left vacant for more than 15 months. (Ford 37-41, ex. 5). Then, on August 26, 2015 (at the proper BoE meeting for personnel requests), the BC fire suppression was reclassified to a fire reduction officer position, and an African American was placed in the spot. *Id*.

### III. GOVERNING SUMMARY JUDGMENT PRINCIPLES

The Fourth Circuit has succinctly stated the governing summary judgment principles as follows:

> In considering a motion for summary judgment, the district court must "view the evidence 'in the light most favorable to the'" nonmoving party. Tolan, 134 S. Ct. at 1866 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed. 1998). The court therefore cannot weigh the evidence or make credibility determinations. *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007) (*citing Anderson*, 477 U.S. at 255); see also Fed. R. Civ. P. 56 Advisory Committee's Note (1963) ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate.").
>
> The Supreme Court recently granted certiorari and issued a decision in a seemingly routine summary judgment case because the lower court had "fail[ed] to credit evidence that contradicted some of its key factual conclusions" and "improperly 'weighed the evidence' and resolved disputed issues in favor of the moving party." *Tolan*, 134 S. Ct. at 1866 (brackets omitted).

*Jacobs v. N.C. Admin, Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015).[18] *See also Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000) ("although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe . . . [and] give credence to the evidence favoring the nonmovant").

All facts must be viewed in the light most flattering to Plaintiff and all reasonable inferences drawn in his favor. As stated by the Supreme Court:

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

---

[18] Fn 8 states: "As Professor Arthur Miller noted recently, 'a motion designed simply for identifying trial-worthy issues has become, on occasion, a vehicle for resolving trial-worthy issues.'" Arthur R. Miller, Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 N.Y.U. L. Rev. 286, 312 (2013).

*Tolan v. Cotton*, 134 S. Ct. 1861, 1863- 68 (2014) (*per curiam*). *See also Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216-17 (4ᵗʰ Cir. 2016)**;** *Gray v. Spillman*, 925 F.2d 90, 95 (4ᵗʰ Cir. 1991).

These principles are embedded in the summary judgment analysis for employment discrimination cases. "Because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent, at the summary judgment stage, the court grant[s] [the] plaintiff the benefit of every favorable inference." *Glunt v. GES Exposition Services*, 123 F. Supp. 2d 847, 869 (D. Md. 2000). *See EEOC v. Town of Elkton*, 2012 U.S. Dist. LEXIS 98193 *61-62 (D. Md. July 13, 2012) ("Few employers who engage in illegal discrimination ... express their discriminatory tendencies in such a direct fashion; indeed, we think that even those employers who claim to be ignorant of this nation's long struggle against various forms of employment bias would find a more subtle approach.").

Further, the Court's inquiry into discriminatory and/or retaliatory intent is not cut short by an employer's caution to a court not to second-guess its business decision and/or not to sit as a super personnel department.[19] *See Westmoreland v. TWC Admin. LLC*, 2019 U.S. App. LEXIS 15141 at *16 n.4 ("nothing bars a jury from considering … whether her employer's justification for her termination is so flimsy as to be *untrue* or *implausible*, and thus asserted in an attempt to mask a discriminatory motive"); *Louis v. Sun Edison, LLC*, 797 F. Supp. 2d 691, 705 (D. Md. 2011) ("resolving questions of this nature lie squarely within the institutional competence of the judiciary and are normally the province of a fact-finder").

## IV. SUMMARY JUDGMENT SHOULD BE DENIED; PLAINTIFF WAS DISCRIMATED BECAUSE OF HIS RACE.

### A. PLAINTIFF WAS DENIED A BC PROMOTION UNDER CIRCUMSTANCES GIVING RISE TO AN INFERENCE OF DISCRIMINATION.

The City argues, wrongly, that Plaintiff has not satisfied the fourth prong of the prima facie case requirement for the failure to promote claims. (DMem. 17-18). The fourth prong requires that Plaintiff

---

[19] *See* DMem. 24, 29.

show that he was not placed into the BC position "under circumstances giving rise to an inference of discrimination." (*Id*. at 18).

The one case cited by Defendant, *Carter v. Ball*, 33 F.2d 450 (4th Cir. 1994), establishes unequivocally that Plaintiff was denied a BC promotion under *facts* that more than give rise to an inference of discrimination. The Fourth Circuit, in *Carter*, stated: "To satisfy the fourth prong, Carter need only show that the position was filled by a white applicant, as he has done." *Id*. at 458.

Satisfying any one of the prima facie case requirements is not an onerous task. *Schafer v. Maryland*, 555 F. Supp. 2d 572, 578 (D. Md. 2008) *reversed on other grounds*, 2009 U.S. App. LEXIS 28629 (4th Cir. Dec. 30, 2009). In *Schafer*, *id,* this Court held that an inference of reverse race discrimination was shown by "an African-American woman" being placed into the sought-after position. *Accord, Howerton v. Bd. of Educ.*, 2015 U.S. Dist. LEXIS 109787 at *24-26 (D. Md. Aug. 18, 2015); *Jackson v. Sebelius*, 2009 U.S. Dist. LEXIS 94084 at *14 (D. Md. Oct. 8, 2009).

    1.   <u>The May 2013 Promotion Denial</u>

The City placed African Americans into the two new BC positions in May 2013. This satisfies the fourth prong of the prima case requirement. The pretext facts (*infra* 25-36) also more than prove that Plaintiff was not promoted under circumstances that establish discrimination.

    2.   <u>The June 2013 Promotional Denial</u>

The City created the third BC position in June 2013. Chief Clack testified that this third BC position was definitely needed and not just a "made-up" job. (Clack 56-57).

Again, the BCFD placed an African-American, L. Carter, into the new BC position, by demoting L. Carter to the position, rather than promoting Plaintiff. The City concedes that Clack could have promoted Plaintiff into the BC position if he wanted; discretion was allowed in this one instance. (DMem. 25). Hence, the fourth prong of the prima facie case requirement is satisfied.

### 3.   January 2014 Promotion Denial And Thereafter

Carter retired in January 2014, and the BCFD chose not to promote Plaintiff into the position, despite the shortage of BCs. Rather, the position was left vacant; then, four months later, in April 2014, the BC position was reclassified into fire suppression position which disqualified Plaintiff. (*supra* 21).

These "circumstances" are sufficient to establish the fourth prong of the prima facie case. In *Harris v. Mayor of Baltimore*, the Fourth Circuit held that the prong is established if "the position remained open or was filled by similarly qualified applicants outside the protected class". 2011 U.S. App. LEXIS 9439 at **20-22 (4th Cir. May 6, 2011).[20]

Plaintiff has satisfied the fourth prima facie case requirement with respect to the January 2014 and, thereafter, promotion denials. The pretext evidence establishes that Plaintiff has done far more than that. (*infra* 36-37).

### B.   THERE IS AMPLE AND COMPELLING EVIDENCE OF PRETEXT REQUIRING THAT THE PROMOTION DISCRIMINATION CLAIMS PROCEED TO TRIAL.

If an employer is able to articulate a nondiscriminatory reason for its action, the employee is required to show that the reason is a pretext or cover-up for unlawful discrimination. In *Westmoreland v. TWC Admin. LLC*, 2019 U.S. App. LEXIS 15141 at **14-15 (4th Cir. May 22, 2019), the Fourth Circuit explained:

> In 2000, the Supreme Court in *Reeves* resolved the circuit split and abrogated this court's pretext-plus standard. … [I]t is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 146-47. This was so because "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* at 147. In such circumstances, "the trier of fact can reasonably infer . . . that the employer is dissembling to cover up a discriminatory purpose."

In *Burgess v. Brown*, 2012 U.S. App. LEXIS 3300 at **11-12 (4th Cir. Feb. 7, 2012), the Fourth Circuit reversed summary judgment for the employer, stating:

> In *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133 (2000), the Supreme Court clarified that a prima facie case of discrimination, combined with evidence from which a jury could conclude that an employer's proffered justification was false, supported an inference of discrimination sufficient to defeat summary judgment. In other words, a plaintiff is not required to provide additional evidence that race was the true reason for the employment decision. The Court further explained as follows:

---

[20] *Accord Gatebe v. Bridenstine*, 2018 U.S. Dist. LEXIS 202049 at **20, 26-27 (D. Md. Nov. 29, 2018).

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive. … Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find the employer's asserted justification false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

1. **Pretext Evidence That Plaintiff Was Not Promoted To BC In May 2013 Because Of Race**

The City's claimed reason for not promoting Plaintiff to BC in May 2013 is that Chief Clack "refused to allow an 'administrative oversight' … to force his hand in not proceeding with promotions from the 2011 List" and that Clack "understood that from whichever List he used, someone from the other List would feel disappointed" and "therefore decided to proceed with his original decision and promote from the 2011 List." (DMem. 8-9, 23-24). So, according to the City, Chief Clack was "conflicted" (DMem. 8) and, exercised discretion to promote off the 2011 list to select the African Americans.

Record evidence establishes this "articulated reason" as a pretext for discrimination.

a. Clack's Exercise Of Discretion, With The Timing Of His Decision And The City's Push For African Americans, Establish Pretext.

The City admits that Chief Clack, by governing policy, was not able to exercise discretion as to who to select for BC promotion in May 2013 (DMem. 5), but that is exactly what he did on account of race.

So as not admit to choosing to promote off an expired list, Clack feigned not to know if the 2011 list had expired. He was evasive at deposition, but did finally have to acknowledge that, if the 2011 list had expired, he should not have been promoted Claggett and Stokes:

Q. Okay. In the middle of the paragraph it states "Respondent acknowledges the list from which these individuals were promoted expired, "Do you agree that the promotion list for Claggett and Stokes had expired at the time of the promotions?
A. I don't know the dates that all of this  happened. What I know is that –
Q. I just asked you, you don't know whether or  not the list had expired, yes or  no?
A. I think that's what's at  issue.
Q. So you don't know the answer to that  question, whether the list had expired or not; is that correct?
A. Well, the list expired at some  point.
Q. Right. - And you don't know whether or  not Claggett and Stokes were promoted off an expired list; is that correct?
A. Well, I think that's the issue  here.
Q. So my question is you don't -- you don't  know `whether or not Claggett and Stokes were promoted off  an expired list; is that  correct?
A. I don't know whether Claggett and Stokes  were promoted off an  expired list. I don't think they could be promoted off an expired  list.

Q. Okay. - And why is that?
A. Because the promotion process in Baltimore is very structured. A lot of the -- the rules around who is promoted are contained in the labor agreement. And so everything that we did had to follow both the labor agreement and the Department of Human Resources rules. (Clack 19-21).

Plaintiff was ranked #1 on the then current and effective promotion list. (*supra* 9). But contrary to all rules, Plaintiff was not promoted.

Additionally, two Battalion Chiefs and a Deputy Chief, with more than 65 years of BCFD experience combined, testified that Clack's action in not promoting off the current list was based on race and the City's desire to promote African Americans. (*supra* 12-13).

Clack knew he was in a dilemma because there were no African Americans on the 2013 BC promotion list. Clack knew that Mayor's office wanted greater minority representation in BCFD BC ranks, acknowledged that race was often discussed in connection with promotions and that there was an "undercurrent of race" in everything he did. (*supra* 6, 8). Moreover, just a few months earlier, the law-commissioned study, that the City states was shared with Clack, showed that only 3% of the BC positions were held by minorities. (*supra* 7).

A desire to achieve greater diversity does not give a license to discriminate and, in cases, like this one, a jury is entitled to decide the true motivation of the employer. *See Rudin v. Lincoln Land Cmty College*, 420 F.3d 712 (7th Cir. 2005*)* (reversing summary judgment to employer, where violated policies with possible purpose of increasing minority representation); *Williams v. Consol. City of Jacksonville*, 2002 U.S. Dist. LEXIS 27066 *18-19 (M.D. Fla. 2002) (denying summary judgment: "Although defendants claimed that the evidence established nothing more than the chief's desire to promote more women and minorities, the allegations did not involve mere techniques of inclusion but instead involved intentional discrimination.").

Further, the timing of Clack's decision further supports a finding of discrimination. On May 9, 2013, Claggett and Stokes were advised that they were not promoted as a result of the BoE inaction. On Friday, May 10th, Claggett and Stokes sent their many emails to the Mayor's Office and City Council with race-based appeals for promotion. Within hours of the emails being sent, the BCFD, through a top aide to Clack,

summoned Claggett and Stokes to a meeting on the Monday morning, May 13th, where Clack announced for the first time that he was promoting them. Clack did not deny that he may have received calls from the Mayor's Office and City Council about race that may have influenced his decision. (*supra* 12).[21]

The timing of Clack's decision to promote after the race-based appeals for promotion and calls from City Officials advocating for the promotion of Claggett and Stokes is pretext evidence. *See Caban v. Met Labs., Inc.,* 2019 U.S. Dist. LEXIS 83280 at *41, 2019 WL 2146915 (D. Md. May 15, 2019) ("[T]he temporal proximity … is indicative of discrimination and of pretextual firing."); *Basil v. Md. Transp. Auth.*, 2014 U.S. Dist. LEXIS 56677 at *24, (D. Md. Apr. 23, 2014) ("the close temporal proximity … is probative of pretext.").

b. <u>Clack's Lack Of Recollection And "Not Knowing" Evidence Pretext.</u>

During his less than four-hour deposition, Clack claimed lack of recollection 104 times and that he did not know 72 times.[22] In addition to claiming that he did not know if the 2011 list had expired, he also incredulously "could not recall":

➢ meeting with Claggett on January 30, 2013, when Claggett complained about Clack promoting a Caucasian (Fletcher) over him to a command position (Clack 64), and the next day, Clack emailed the Mayor's office and his staff about creating two new Battalion Chief positions;

➢ meeting Claggett and/or Stokes on May 13, 2013 or at any time around then (Clack 86-88, 99-100), when he informed them of their BC promotions and Claggett provided him with a written agenda which expressly referenced the "lack of diversity" in the BC ranks;

➢ how Claggett and Stokes could be retroactively promoted, on paper, to BC, with an effective date a full week before the Board of Estimates approved and created the BC positions (Clack 72);

➢ who told him that he could allegedly use an "in lieu of" non-authorized process to retroactively place Claggett and Stokes into high ranking command staff positions "on paper" only from which they were promoted into the BC positions (Clack 24, 101-102); and

➢ any study or analysis commissioned by the Mayor (thorough the City Solicitor) about the hiring, disciplinary practices, and/or underrepresentation of African Americans in BC positions before his promotions of Claggett and Stokes, even though the City stated that it had shared the entire report with him (*supra* 7).

---

[21] Clack may not have worried about the consequences of his discriminatory actions because he may have known he was quitting his Chief job when he made his May 13th promotion decision. (*supra* 12).

[22] The line/page numbers of Clack's "lack of recollection" and "do not know" responses are set forth in <mark>EXHIBIT 23</mark>.

The lack of recall of a decisionmaker supports a finding of pretext. *See Dennis v. Columbia Colleton Med. Ctr.*, Inc., 290 F.3d 639, 646-47 (4th Cir. 2002) (noting that a jury's finding of pretext supported by testimony of decisionmaker who was "unable to recall many details"); *Wright v. Efficient Lighting Sys.*, 2003 U.S. App. LEXIS 8028 at **16-18 (7th Cir. April 25, 2003) (summary judgement reversed, "from these facts a reasonable jury could so infer, especially if during cross-examination [decider's] claims not to remember his afternoon conversation with Wright were called into question").[23]

c. <u>The BCFD's Blatant Disregard Of Governing Rules Provides Compelling Evidence Of Pretext.</u>

The City fails to cite or refer to any of the governing BC promotion rules, knowing that the BCFD failed to comply with them in order to discriminate against Plaintiff. The following chart proves this point:

| Rule & Provision: | Noncompliance Facts: |
|---|---|
| MOU, Article 25 (*supra* 5):<br>"A. The Employer will not deviate from the present policy of selection of the first candidate on a list, through all grades up to and including Battalion Chief. B. Promotion lists shall run for two years from posted date…C. Vacancies shall be filled from current eligible lists commencing with the following period …" | 1. BCFD deviated from the list that became effective on midnight between May 12 and May 13, 2013. No rule or policy allowed for this.<br>2. The 2011 list expired two years from its posting date, at the end of May 12, 2013.<br>3. There was no BC vacancy until May 15, 2013, when the Board of Estimated created and funded the two new BC positions.<br>4. Clack exercised discretion which he was not empowered to do. |
| MOP Policy 355 (*supra* 6):<br>"It is Baltimore City Fire Department policy to fill vacancies via promotions when, but not before, those vacancies exist. Generally, a promotion becomes effective on the first day of the pay period immediately following the vacancy date." | 1. The BC vacancies did not exist until May 15, 2013; however, the BCFD placed Claggett and Stokes, on May 13th retroactively into the positions, effective on May 8th. No rule or policy allowed for this.<br>2. Promotions of Claggett and Stokes were retroactive as was their BC pay which was "effective for payroll purposes" on "May 8, 2013, evidencing that BCFD action was improper. (Clack 74-78, ex. 13). |
| Policy/Procedure AM-235-1 (*supra* 17):<br>"A promotion is a movement by the employee from an existing position to a vacant and funded position of a higher classification and grade. … In the case, an employee is required to pass the certification examination and be selected from the list." | 1. There was no vacant and funded BC position into which a person could be promoted until May 15th, when the Board of Estimates approved and funded the BC position.<br>2. Plaintiff was #1 on the promotion list for BC promotion on May 15th. Neither Claggett nor Stokes was not on the list. Claggett did not apply, and Stokes did not sit, for the examination. (Claggett 43-45) (Stokes 80). |

---

[23] *See also* Park & Liminger, The NEW WIGMORE A TREATISE ON EVIDENCE, § 5.3 (2018) ("if the trier of a fact decides that the forgetfulness is feigned, it can use the witnesses willingness to lie about forgetfulness as evidence that the witness has lied about other aspects of the case"); 3A J. Wigmore, EVIDENCE § 1043, at 1061 (Chadbourn rev. 1970) ("[An] unwilling witness often takes refuge in a failure to remember, and the astute liar is sometimes impregnable unless his flank can be exposed to an attack of this sort.").

29

Courts uniformly hold that summary judgment is not appropriate in "promotion list" cases where employers have not followed the proper rules. For example, in *Johnson v. City of Charlotte*, 229 F. Supp. 2d 488 (W.D. N.C. 2002), the trial court denied summary judgment, stating: "Had the Fire Department followed its practice of promoting sequentially down the list, [the female] would have been promoted. *Id*. at 489. *See also Richardson v. City of Hampton*, 1996 U.S. Dist. LEXIS 15437 at *14-15 (E.D. Va. May 30, 1996) (summary judgment denied in a reverse discrimination case, where claimant was ranked higher on the then governing promotion list and rules not followed); *Diaz v. City of Inkster*, 2006 U.S. Dist. LEXIS 53456 at *38 (E.D. Mich. Aug. 2, 2006) (summary judgment in reverse discrimination failure to promote case where promotion list fact issues remained).

Clack's failure to follow the strict rules governing promotions constitutes very strong pretext evidence. *See Hudock v. Kent County Board of Education*, 2015 U.S. Dist. LEXIS 31621 at *31 (D. Md. Mar. 16, 2015); *Lockley v. Town of Berwyn Heights*, 2015 U.S. Dist. LEXIS 121215 at *21-23 (D. Md. Sept. 11, 2015) ("courts in this District have found that for an employer's violation of its internal policies to be evidence of pretext"). A jury must resolve the issue whether race discrimination caused Clack failure to comply with the objective mandated rule requiring the promotion of the candidates from the current and effective promotion list. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 226 (4th Cir. 2019) ("a genuine dispute of fact exists as to whether …this represents an inconsistency and evidence of pretext."); *Stennis v. Bowie State Univ.*, 2019 U.S. Dist. LEXIS 59085 at *34 (D. Md. Apr. 5, 2019) ("it must be left to the jury to determine whether Stevenson's reliance on criteria different than that endorsed by the University points toward pretext").[24]

---

[24] Significantly, in the case at hand, Plaintiff presents numerous facts, in addition to multiple rule violations, to establish pretext. Hence, this is not a case depending on only a single policy violation to establish pretext or a non-material violation. The cases relied on by City are not analogous. (DMem. 22). *Langerman v. Thompson*, 155 F. Supp. 2d 490, 498-99 (D. Md. 2001), concerned claimed "deficiencies" in a selection plan (not violations of a rule) that affected all candidates (not like the case at hand, where the policy violation resulted in promoting only the African Americans). *EEOC v. Texas Instruments*, 100 F. 3d 1173, 1181-83 (5th Cir. 1996) (pre-*Reeves v. Sanderson Plumbing Prod.*), concerned a new layoff policy that affected all candidates equally and where there was no other pretext evidence. *Randle v. City of Aurora*, 69 F.3d 441, 454-55 (10th Cir. 1995) (pre-*Reeves*), was about an employer who did not post an open position, so the claimant could not apply; there was no rule violation; the court noted that the employer had a "reasonable interpretation" of the policy which did require posting.

d. The BCFD's Evolving After-The-Fact Distorted Reliance On Clearly Inapplicable Rules Provides <u>Persuasive Pretext Evidence.</u>

The BCFD also relied on "rules that" were clearly not applicable, as well as distorted their terms, in an attempt to try to cover-up the discrimination. Moreover, the "rules" that were relied on evolved over time and were after-the-fact creations.

The BCFD first tried to get away with the argument that there could be two current and effective eligible list at the same time. (*supra* 13). Four weeks after the May 2013 promotions, the BCFD had to acknowledge that there can be only one current and effective promotion list and that, as of midnight between May 12th and May 13th, the list on which the two Caucasians placed #1 and 2.[25]

When the BCFD could not get away with claiming that there could be two effective lists at the same time, City DHR came up with a new excuse for the BCFD action, stating: "Eligibility lists are certified to the agencies upon request. Once an eligibly list has been certified to an agency, they have 60 days to make a selection" (*supra* 13-14). However, the City did not identify the rule or policy that contained this alleged provision. *Id*.

Years later, in discovery, the City for the first time referred to the Civil Service Commission Rules as containing this authority. When those Rules are examined, the City argument becomes obviously disingenuous. While Civil Service Rule 29 does have a provision that a certification request is good for 60 days, the very first sentence states that request can only be made "[w]henever a vacancy occurs". (*supra* 14). In this case, there was no vacancy until May 15, 2013, eight days after the BCFD claimed it requested the appointment of Claggett and Stokes. *Id*.

When the Civil Service Commission Rule excuse failed, the City came up with its last after-the-fact explanation for its actions – that Claggett and Stokes (without them knowing it) were, on May 8th, transferred, on paper only, to much higher command staff positions "and then on May 15th, promoted into the BC position. (*supra* 14-15).

---

[25] The City now does the same, claiming that "the 2011 Battalion Chief List was due to expire" on May 13, 2013, when it knows that it expired on midnight between May 12th and May 13th. (DMem. 5).

This "in lieu of" process which the City contends it followed was not allowed by rule, policy or procedure and never really done, as evidenced by:

**1.** The AM's "in lieu of" provision is part of the "transfer" policy, which is very detailed and which states unequivocally that "[t]his Policy does **not** apply to promotions." … "A City Agency **must not use the transfer policy as a device to promote someone to a higher position**." (Emphasis added.) The BCFD promoted Claggett and Stokes; there was no transfer.

**2.** An "in lieu of" transfer is only permitted if the agency "fill[s] a vacant position with an employee whose job class is not the same as the class of the vacant position if such action will allow the individual to gain the necessary experience to qualify for the class. To be eligible, the employee's class and the class of the vacant position must be in the same class series. (For example, a Senior Clerk position may be filled with a Clerk "in lieu" of a Senior Clerk.)". The positions that Claggett and Stokes allegedly were placed into, without their knowledge, were respectively, Executive Level I and Fire Command II. The positions were not in the same class series as BC; they were fire command appointed, nonunion positions.

**3.** The BCFD did not obtain DHR prior authorization for the claimed "in lieu of" action, as required. DHR never approved the action before it occurred.

**4.** The BCFD never before had used the "in lieu of" in a similar situation. The City could not identify a single occasion or incident when a person was placed into a higher-level position that was required to be competitively filled over someone who was ranked on a promotions list. Such action, if permitted, would render the competitive promotion process meaningless.[26]

**5.** The BCFD never even used the "in lieu of" process and simply claimed that it did by creating documents after the fact – all to hide the discrimination. (*supra* 16-17).

**6.** There was not an open Fire Command II staff position in which to place Stokes, according to BCFD's payroll records. As a result, the City has suggested that the payroll records were inaccurate.

The above facts show pretext, at least enough for the ultimate decision to be made by a jury. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 226 (4th Cir. 2019) ("because … reason for his termination has

---

[26] Relying on the testimony of the BCFD current HR Director, Lisa Wood, the City claims that the BCFD "routinely uses the *in lieu* policy to place EMTs into the higher Paramedic position, because there are no vacant EMT slots available". (DMem. 9). That claim goes nowhere because (a) EMTs and paramedics are both Union positions and in the same class series, and (b) Wood herself testified that "we hire the EMTs and give them the opportunity to gain the experience to become paramedics" which is the consistent with the AM "in lieu of" policy's stated purpose. (Wood 56-58). Further, HR Director Wood (a) did not start working for the BCFD until January 23, 20**18** (Wood 6-7); (b) has no knowledge of the "in lieu of use" any time before she started in 2018 (Woods 27); and (c) never read or even asked to see the "in lieu of" policy (Wood 55). Woods, like the former HR Business Partner, B. Ryer, testified that DHR had to approve any "in lieu of" action. (Wood 51-52). Ryer, in fact, testified that "budgetary approval" had to be obtained from DHR before any "in lieu of" action. (Ryer 158-59). Also, the City does not deny that there has never before an "in lieu of" case like the present one. (Wood 53-53) (*supra* 16-17).

changed substantially over time, [plaintiff] has presented sufficient evidence of pretext.").[27]

      e.  <u>The Destruction Of EEO Files, At The Very Least, Requires A Pretext Finding.</u>

The BCFD HR Business Partner & EEO Officer, B. Ryer, testified the she destroyed all of her EEO file materials, long after she was aware of Plaintiff's lawsuit. (*supra* 4). The file materials consisted of her 2013 interview notes and/or recordings, and her decision if Plaintiff's discrimination claim had merit. *Id*. No one from the City ever told her to retain the documents or safeguard them before she retired in March 2019. *Id*. Ryer offered no valid reason for the destruction of the EEO file materials. At the time of the destruction, she had been employed by the City for more than 30 years. (Ryer 4-5).

This destruction of evidence supports a finding of pretext. *See Kronisch v. U.S.*, 150 F.3d 112, 128-29 (2nd Cir. 2008) (reversing summary judgment, "plaintiff has produced enough circumstantial evidence to support the inference that the destroyed [employer] files may have contained documents supporting (or potentially proving) his claim, and that the possibility that a jury would choose to draw such an inference, combined with plaintiff's circumstantial evidence, is enough to entitle plaintiff to a jury trial").[28]

      f.  <u>The Procedural Irregularities Show Pretext.</u>

The BCFD claims that an "administrative oversight" occurred. However, the BCFD fails to recognize that an "administrative oversight" does not excuse the unlawful race discrimination.

---

[27] S*ee also Wesley v. Arlington Cnty.*, 2009 U.S. App. LEXIS 26554 at **18-19 (4th Cir. 2009); *Lauer v. Schewel Furniture Co.*, 2004 U.S. App. LEXIS 53 at **17 (4th Cir. 2004); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002) ("The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext."); *Saah v. Thumel*, 2017 U.S. Dist. LEXIS 17015, at *29 (D. Md. Feb. 7, 2017) ("The Fourth Circuit has held that an employer's provision of shifting and inconsistent justifications for taking an adverse employment action 'is, in and of itself, probative of pretext.").

[28] S*ee also Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1378-81 (S.D. Ga. 2008) (employee relation specialist's negligent destruction, albeit years later, of employee's investigative notes and file materials required finding that employee had met his pretext burden for defeating summary judgment, because "destroyed notes may have been informative" about the claimed "failure to follow procedures"); *Scott v. IBM Corp.*, 196 F.R.D. 233, 245-46 (D. N.J. 2000) ([employer's] decision to destroy these documents could give rise to a "spoliation inference" which could be found by a reasonable jury to cast doubt on [employer's]proffered legitimate reasons for discharge, and thus establishing pretext for both plaintiff's Title VII and ADEA claims").

Only after only Caucasian officers sat for the BC examination in April 2013, did the BCFD go into "high gear" to try to make sure that the African Americans from the 2011 list were promoted. To do so, the BCFD committed numerous procedural irregularities, including:

1. The BCFD failed to comply with the BoE published schedule of meetings for approval of personnel actions. The BCFD tried to rush the action for the May 8, 2013 non-personnel request BoE Board meeting, before the 2011 list expired a few days later. The BoE could have simply decided to follow its own published schedule.

2. The BCFD failed to complete the necessary paperwork. The BCFD, without explanation, failed to comply with the AM process, which takes four to five weeks, for obtaining the written approval of four different City agencies for the funding and creation of two new BC positions. Instead, it used a "telephone poll request" form (not included within the AM) with suspicious dates written on it and which was not complete because the City Labor Commissioner neither approved nor disapproved of the requested action.[29]

3. For the first time ever, the BCFD obtained the Union's waiver of the 15-day notice period. Because the BCFD was so rushed to beat the 2011 promotion list expiration date, it had to get the Union to agree to waive the notice period for the creation or abolishment of a Union position. This had never been done before, and the BCFD actually wrote the letter for the Union to sign agreeing to waive.

These procedural irregularities evidence pretext. *Stennis v. Bowie State Univ.*, 2019 U.S. Dist. LEXIS 59085, at *27 (D. Md. Apr. 5, 2019) (citing Fourth Circuit case law).

       g. The Two Central Documents Relied Upon By The City Are Suspect And Probative Of Pretext.

The City relies on two BCFD documents for its "nondiscriminatory" action.

First, the City claims that "on May 8, 2013", before the BoE funded and approved the two new BC positions, the BCFD "sent a requisition to central DHR requesting a certified list of candidates from on the 2011 Battalion Chief's Eligibility List". The City so-called "requisition" document (exhibit V to DMem.) was produced late in discovery by the City, via email and without explanation, less the 24 hours before the deposition of DHR HR Specialist Ross. (Ross 80, ex 12, page 3). Contrary to what the City said in the

---

[29] The Labor Commissioner has now signed an affidavit claiming that she inadvertently failed to state whether or not she approved or disapproved on the form - another conveniently-timed claimed "oversight."

accompanying email, Ms. Ross testified unequivocally, that the document produced was **not** the "requisition". (Ross 93-94). Further, her testimony revealed that the document produced was suspect because the "action date predates the effective date" on the document. (Ross 86-89). Ms. Ross was at a loss to explain the inconsistencies in the document, stating:

> So the eligible date, it expired 5/13/13. So the effective date would have changed. It would have changed – I'm sorry. The action date would have changed when – that's not true either. I'm going to leave this alone because I would have to do some more research in looking at this referral list in order to make an -- to answer that.

(Ross 88). DHR HR Specialist Ross also offered that someone could have easily changed whatever dates were originally on the document. (Ross 87).

The second document is an "Order announcing the promotions of Claggett and Stokes" "prepared" "through an aide to Chief Clack" allegedly on May 8, 2013. The aide, Wayne Robinson, was **not** identified as one of 18 persons with knowledge by Defendant (City Response to Interrogatory 1, EXHIBIT 18), and Chief Clack and his Chief of Staff never mentioned the aide's name in response to questions about the "Order" or any other deposition question.

The claim that the "Order" was drafted on May 8th conflicts with the testimony of Stokes who testified that Clack told her, on May 13th, that: "I am promoting you today. I am backdating the Order to May 8th". (Stokes 38-39). Hence, there was no Order drafted before May 13th.[30]

Stacy Scardina, a 20-year BCFD employee has testified under oath in the attached Affidavit that she spoke to Mr. Robinson on May 13th and that he told her that the general order for the promotions had **not** yet been prepared. (EXHIBIT 24). The Plaintiff, in his attached Affidavit, testifies that the pdf formatted general orders shows that they were not created until May 13, 2013. (EXHIBIT 25).

Further, if the document was actually prepared on May 8th, that totally undercuts the City's argument that Claggett and Stokes were "in lieu of" placed into an Executive Level I and Fire Command II position from May 8th to May 15th, since the Order has them working in non-existent BC positions on May 8th.

---

[30] Clack claimed not to know if the "Order" was backdated. (Clack 74-75).

The lack of dispositive documentation of a nondiscriminatory reason provides further support for a pretext finding. *See Hamilton v. Geitner,* 666 F.3d 1344, 1357 (D.C. Cir. 2012) ("the absence of any contemporaneous documentation supporting that explanation could lead a reasonable jury to disbelieve the [employer] and to reach a verdict in [the employee's favor"); *Monticciolo v. City of Grosse Pointe*, 2013 U.S. Dist. LEXIS 69847 at * 18 (E.D. Mich. May 16, 2013) ("a lack of contemporaneous documentation of a defendant's proffered explanation for making a decision can sometimes support an inference of pretext").

### 2. Pretext Evidence That Plaintiff Was Not Promoted To BC In June 2013 Because Of Race

The BCFD, on June 26, 2013, at the proper BoE meeting for personnel actions, obtained approval and funding for a third BC position, into which he placed African American L. Carter. Clack allowed Carter to demote into the position, rather than promoting Plaintiff, because of Clack's claimed "practice to allow [command staff] members to demote back to the position of BC." (DMem. 26).

The one example of Clack's "practice" provided by the City is that of William Cate, a Caucasian. However, Cate, unlike Carter had no performance problems, and had actually **asked** to be demoted. (Clack 149-50, "[C]ate decided he wanted to go back to" a BC).

Further, Clack chose to place Carter in the BC position only after: (a) Carter had sued the City and Clack for race discrimination; (b) the City's study was released showing a lack of diversity in the BC ranks, and (c) Clack had eliminated the "minority outreach" program of which Carter headed.

Clack chose an African American for the third new BC position, and not Plaintiff, because of race. The facts are more than sufficient to cast serious doubt on the City's claim that race did not enter into Clack's decision.

### 3. Pretext Evidence That Plaintiff Not Promoted In January 2014 And Thereafter Because Of Race

After not being promoted in May 2013 and June 2013, and despite being on the top of the BC promotion list, Plaintiff again, but for his race, should have been promoted to the BC position held and then vacated by African American Carter in January 2014. (Carter held the position for about six months but actually

worked in it for about three weeks). Rather than doing so, the BCFD held the position vacant and then reclassified it so as to disqualify Plaintiff. (*supra* 21).

The stated reason for the BCFD's action is that Chief Segal (Clack's former Assistant Chief) allegedly decided that the BC position given to Carter was "unnecessary". Directly contrary to Clack's testimony, Segal claimed that Clack had just made-up the BC job and got the BoE to approve it. (DMem. 14). Clack said the exact opposite. He stated the position was needed and not made-up (*supra* 19, 21); and the City states, in its own memorandum that more BC positions "were sorely needed" (DMem. 20).

The material inconsistency is strong evidence of pretext. *See Dennis v. Columbia Colleton Med. Ctr.*, *Inc.*, 290 F.3d at 647 ("The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext.").[31]

In a two-month span, three new BC positions were created, and African Americans were placed into them. Then, all of a sudden, when the BCFD has no possible legitimate excuse for not promoting Plaintiff into the BC position that African American L. Carter held, the position was left vacant and then reclassified it to a position from which Plaintiff was automatically disqualified from and into which an African American was promoted into 15 months later.

Leaving a position vacant and then reclassifying it, like here, is classic pretext evidence. *See Glenn-Davis v. City of Oakland*, 2005 U.S. App. LEXIS 4281 (Mar. 15, 2005) (9th Cir. 2005) (reversing summary judgment for defendant on gender discrimination claim premised on employer leaving position vacant rather than promoting claimant who was #1 on list).[32]

---

[31] The City's claim that Segal did not promote Plaintiff into the BC position in January 2014 or thereafter because Segal believed that there was need for further BCs in EMS, not only is contradictory to Clack's testimony, but also is contradicted by Segal's own conduct. The City, apparently wanting to waive Fed. R. Evid. 408, notes that Segal offered to create two new BC positions in EMS in the November 2013 grievance hearing about the May 2013 promotions. (DMem. 13).

[32] *Paoli v. Wilkie,* 2018 U.S. Dist. LEXIS 165767 *15-16 n.9 (N.D. Ill. Sept.26, 2018) (summary judgment denied for employer, when [claimant] "was not selected from the first promotion certificate to fill the second vacancy"); *Shockley v. Minner*, 726 F. Supp. 2d 368, 378 (D. Del. 2010) (summary judgment denied in reverse discrimination where employee did not permanently fill vacancy which denied claimant the position).

**V. SUMMARY JUDGMENT SHOULD BE DENIED; PLANTIFF WAS RETALIATED AGAINST.**

**A. PLAINTIFF'S OUT-OF-TITLE PAY WAS DISCONTINUED BECAUSE OF HIS PROTECTED ACTIVITY.**

The City concedes that Plaintiff has established a prima facie case of retaliation, since Segal's order to stop the acting BC pay for Plaintiff came within four weeks of Plaintiff's internal complaint of discrimination and his EEOC charge-filing. It just claims that the BCFD made a mistake and that Plaintiff should never gotten acting BC pay and that Plaintiff was not performing all required BC tasks. (DMem. 30).

The "mistake" excuse is without merit. The reality is that the BCFD placed other BCs in the same position for which Plaintiff was "acting-in". Under the labor agreement, it was "impossible" that a BC would "ever be asked to serve in a lower level" position and "receive acting-out pay in a battalion chief level." (Perricone 27). Further, Deputy Chief Perricone testified that Segal had instructed him to create the work for the BC position given to Carter and nothing was said about Carter not working at a BC level in the position. (*supra* 20)

The alternative explanation offered Plaintiff was not performing two required tasks: writing or developing a job description, and assuming field operations is equally meritless. Plaintiff has detailed numerous facts that establish that he had performed the two tasks[33] and the falsity of the City's explanation. (*supra* 20-21). The falsity of the BCFD's explanation establishes pretext. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. at 137, *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d at 646-47; *EEOC v. Sears Roebuck & Co.*, 243 F.3d at 857 (4th Cir. 2001); *EEOC v. Dimensions Healthcare Sys.*, 2016 U.S. Dist. LEXIS 118775, at *19 (D. Md. Sep. 2, 2016).

---

[33] Plaintiff was "shell-shocked" at the grievance hearing when the BCFD officials lied about what he did as MDO and, therefore, could not recall doing the two tasks, which he subsequently has established he did do. This one single aspect of his testimony only goes to his credibility for a jury to assess and not as a factor militating summary judgment. *See Hodges v. Federal-Mogul Corp.*, 621 Fed. Appx. 735 *; 2015 U.S. App. LEXIS 11765 **17-19 (4th Cir. July 8, 2015) (Claimant's "testimony was most assuredly unsured" … "and the district court erred by assessing [his] credibility and rejecting his evidence at the summary judgment stage"); *Chen v. Royal Garden Adult Med. Daycare Ctr. Inc.*, 2018 U.S. Dist. LEXIS 205916 at *14 (D. Md. Dec.6, 2018) (summary judgment not warranted because of employee's "contradictory testimony", he produced sufficient facts supporting his claim).

In addition, the close temporal relationship between Plaintiff's protected activity and Segal's order provides evidence of pretext. *See Stennis v. Bowie State Univ.*, 2019 U.S. Dist. LEXIS 59085 at *27) ("[C]lose temporal proximity between a plaintiff's protected activity and the adverse action taken against her, and failure to abide by regular procedures, are probative of pretext." (*quoting Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295-99 (4th Cir. 2010)); *Jaudon v. Elder Health, Inc.*, 125 F. Supp. 2d 153, 169 (D. Md. 2000) (denying summary judgement because of "the temporal proximity between plaintiff's complaint and the resulting reprimand of Mr. Amos and plaintiff's termination.").

Further, the City's outright lie to the EEOC (*supra* 20) that Deputy Chief Fletcher made the determination that Plaintiff was not doing BC work strongly supports a pretext finding. *See Wilson v. Phoenix Specialty Mfg. Co.* 513 F.3d 378, 383-84 (4th Cir. 2008) (reasonable jury could conclude that false statements in EEOC position evidenced pretext for discrimination); *EEOC v. Sears Roebuck*, 243 F.3d 846, 849 (4th Cir. 2000) (summary judgement for employer reversed, false statement in EEOC position supported pretext finding). No one ever asked Fletcher for his input; he was just ordered to stop the acting pay. (*supra* 20).

Additionally, even if Plaintiff (and others were not doing all BC work), the facts still show that but for Plaintiff's protected activity, the acting pay would have continued. So, even if Defendant was right, that does not excuse the retaliation. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208 (4th Cir. 2016) (summary judgment reversed where employer claimed it did not have enough work for the claimant, which could have been true, but evidence was sufficient for a reasonable jury to determine that employer eliminated the position only because of the claimant's protected activity).

Lastly, the argument that the BCFD stopped acting pay for everyone is not fatal to Plaintiff's claim. An employer's action in stopping a benefit in retaliation for one employee's complaint of discrimination, is no less retaliatory simply because the employer stops the benefit to others to hide the retaliation. *See Miles v. Dell, Inc.,* 429 F.3d 480, 485, 488 (4th Cir. 2005) (guilty employers may "take action to disguise

its act"); *Jones v. Western Geophysical Co.*, 669 F.2d 280 (5ᵗʰ Cir. 1982) ("his replacement by another black person was a pretextual device, specifically designed by Wester to disguise its act of discrimination").

**B.   THE BCFD RETALIATED AGAINST PLAINTIFF BY ABOLISHING THE BC POSITION INTO WHICH HE SHOULD HAVE BEEN PROMOTED.**

In April 2014, the BCFD, through Segal, requested and obtained the approval from the BoE to reclassify the BC position Carter held, that Plaintiff had been acting-in, and was next-in line to be promoted into. (*supra* 21). The City claims that this obviously retaliatory action was not retaliation because Plaintiff had not engaged in protected activity before Segal informed the Union in December 2013 that he was planning to reclassify the BC position.

There is more than sufficient record evidence of Plaintiff's protected activity In November 2013, at the Labor Commissioner hearing over the May 2013 promotions, Plaintiff specifically objected to the Claggett and Stokes emails which contained the race-based appeals (albeit Plaintiff did not use the term "discrimination") (P 42-43). Claggett and Stokes were obviously of a different race and, when combined with the nature of their emails, there was more than inference Plaintiff was objecting to the race discrimination. Further, when he presented his first step grievance to a BCFD management official and a Union official in May 2013, Plaintiff specifically stated that the reason he was not promoted was because of race. (*supra* 13). In an email string in June 2013, on which Chief Segal cc'd, Plaintiff asked for "same equal opportunity" to meet with Chief Clack, as he did with Claggett and Stokes. (Clack 152-56, ex 34). The meeting request was denied. (*Id*.)

Plaintiff was not required "to utter the 'magic words Title VII' to have engaged in protected activity." *Geib v. Performance Food Grp., Inc.*, 2016 U.S. Dist. LEXIS 104002 at **14-15 (D. Md. Aug. 8, 2016). In *Young v. Giant Food Stores, LLC*, this Court denied summary judgment to an employer making the same argument as the City now does:

> No particular magic words are required, all that is necessary is that "the employee at least have actually opposed employment practices made unlawful *by Title VII*," rather than raised generalized workplace grievances. *McNair v. Computer Data Sys., Inc.* 172 F.3d 863 at *5 (4th Cir. 1999). There can be no question that complaining of disparate treatment as compared to male co-workers was sufficient to inform her

employer that Young was objecting to perceived sex discrimination. Accordingly, her activity, as alleged, was protected.

108 F. Supp. 3d 301, 317 (D. Md. 2015).[34]

Moreover, Segal did not act to get the BoE to reclassify until shortly after Plaintiff had complained to the BCFD EEO Officer and had filed his first EEOC complaint. His December 2013 notice to the Union about an intent to reclassify does not excuse the later retaliation. There is no personnel action until the BoE approves an action and that action did not occur until April 2014, after Plaintiff's clear and repeated objections to the race discrimination.

Chief Clack, Chief of Staffing Nutting, and Deputy Chief Perricone all testified that more BCs were needed. When Clack was asked: "[w]ere you just creating a position for Mr. Carter so he would have a job with the Baltimore City  Fire Department if he chose not to  retire?", Chief Clack answered with a firm "no" (Clack 56-57), and the City states that more BCs were "sorely needed". (DMem. 20)

Plaintiff has established that the stated reason for the BC reclassification was pretextual. (*supra* 36-37), Therefore, the retaliation claim should proceed to trial.

## VI. <u>CONCLUSION</u>

Plaintiff respectfully submits that he has presented substantial evidence of unlawful discrimination and retaliation. The employer's "reasons" for the adverse employment actions have been shown to be inconsistent, false, created after-the-fact, not supported by credible documentation, and noncompliant with governing rules and polices. Additionally, the credibility of one of its primary decisionmakers is clearly in question due to his shocking lack of recollection and knowledge. Lastly, the destruction of Plaintiff's internal EEO file materials deprived Plaintiff of possible material supporting evidence.

---

[34] *See also Barnett v. Lowes Home Ctrs., LLC*, 2019 U.S. Dist. LEXIS 34645, at *19-20 (E.D. Pa. Mar. 4, 2019) ("Complaints, however, need not specify 'discrimination' or other 'magic words' to qualify as protected activity."); *Gustafson v. Genesco, Inc.*, 320 F. Supp. 3d 1032, 1050-51 (S.D. Iowa 2018) ("The complaint needs to only provide enough facts to raise an inference that she was complaining of an unlawful employment practice.").

The summary judgment motion should be denied.

Respectfully submitted,

_____/s/_____
Stephen B. Lebau, Esq. (Bar No. 07258)
LEBAU & NEUWORTH, LLC
606 Baltimore Avenue – Suite 201
Towson, Maryland 21204
*sl@joblaws.net*
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of June 2019, I served this Opposition, via CM/ECF upon the following counsel for Defendant:

Gary Gilkey, Esq.
Chief Solicitor - Baltimore City Law Department
100 North Holliday Street – Room 136
Baltimore, Maryland 21202

Further, within 48 hours of the electronic filing of this Opposition, a courtesy copy shall be delivered to the Clerk's Office.

_____/s/_____
Stephen B. Lebau