# IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Northern Division*

|  |  |  |
|---|---|---|
| **DONALD DZIWULSKI,** | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | **Case No.: DLB-18-277** |
| | * | |
| **MAYOR & CITY COUNCIL** | * | |
| **OF BALTIMORE,** | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Donald Dziwulski, a Caucasian, works as a Captain in the Emergency Medical Services division of the Baltimore City Fire Department ("Department"). During a period in which Captain Dziwulski believed he should have been promoted to Battalion Chief, the Department placed three African American employees into the position *in seriatim*, but not him, and then it discontinued his out-of-title pay and reclassified one of the Battalion Chief positions, such that he no longer qualified for it. In response, he filed this lawsuit against the Mayor and City Council of Baltimore, claiming race discrimination and retaliation. Pending is Defendant Mayor and City Council of Baltimore's Motion for Summary Judgment. ECF No. 40.[1] Because genuine disputes exist regarding the material facts underlying Captain Dziwulski's claim for race discrimination based on failure to promote and his claim for retaliation based on the reclassification of a position, Defendant's motion is denied in part. It is

---

[1] The parties fully briefed the motion. ECF Nos. 40-1, 43, 46. Captain Dziwulski also filed a Motion to File a Surreply, ECF No. 47, and a proposed surreply, ECF No. 47-1. Because the proposed surreply is brief and submitted to provide clarification regarding an incomplete citation in Defendant's reply, *see* Pl.'s Mot. 1, Captain Dziwulski's motion is granted and the surreply is accepted as filed. *See* Loc. R. 105.2(a). A hearing is not necessary. *See* Loc. R. 105.6.

granted as to Dziwulski's claim for race discrimination based on the decrease in his pay because, on the record before me, Dziwulski cannot establish a *prima facie* case. I also will grant Defendant's motion as to Dziwulski's other retaliation claims, because he has not identified any material facts that create a genuine dispute regarding the Department's legitimate, non-retaliatory reason for decreasing his pay, and he has abandoned his other retaliation claims.

## Background

Captain Dziwulski, who has worked for the Department for more than twenty years, is a Captain in the Emergency Medical Services division. Pl.'s Opp'n 1; Def's Mem. 2. He sought a promotion to Battalion Chief in 2013, when James Clack was Chief of the Fire Department. Pl.'s Opp'n 1–2; Def's Mem. 6–7. To become eligible for the promotion, he took an examination that the Department administers every other year to Battalion Chief candidates; the candidates who score high enough are ranked by score on a list ("Eligibles List") that is valid for two years and then expires. Pl.'s Opp'n 1; Def's Mem. 4–5, 7. Captain Dziwulski was ranked first on the Eligibles List that went into effect on May 13, 2013. Pl.'s Opp'n 1; Def's Mem. 10. Yet, on that same day, Fire Chief Clack announced two new promotions, and Dziwulski was not among them. Pl.'s Opp'n 1; Def's Mem. 10. Rather, Clack promoted two African Americans (Tavon Claggett and Charline Stokes) who were ranked first and second on the two-year-old May 13, 2011 Eligibles List, which had expired hours earlier. Pl.'s Opp'n 1; Def's Mem. 5, 9–10.

Then, when Fire Chief Clack created another Battalion Chief position in June 2013, he placed Lloyd Carter, an African American who had been a Deputy Chief, into the Battalion Chief position instead of promoting Captain Dziwulski.[2] Def.'s Mem. 6, 12; Pl.'s Opp'n 2. Within days of becoming

---

[2] It is unclear whether Carter was demoted because he "was struggling as a . . . deputy chief" and Clack wanted to "accommodate [him] rather than fire [him]," Clack Dep. 53:11–14, or because "[t]he division that he oversaw due to budget was abolished," Segal Dep. 16:13–21. In either case, Clack

a Battalion Chief, Carter went out on leave. Pl.'s Opp'n 19; Def.'s Mem. 13. Soon after that, Fire Chief Clack resigned and Jeffrey Segal, Clack's Deputy Chief, became Interim Fire Chief. Pl.'s Opp'n 19; Def.'s Mem. 12. Captain Dziwulski and "other officers, other firefighters . . . filled in for Mr. Carter's BCEMS [Battalion Chief – Emergency Medical Services ('EMS')] position when he was doing the MDO [Medical Duty Officer] function and got acting out-of-title pay," which Deputy Chief Mark Fletcher had authorized. Fletcher Dep. 37:6–38:4, 41:13–18; *see* Pl.'s Opp'n 2, 19; Def.'s Mem. 13 ("During and after the time Carter was on terminal leave, Plaintiff and others assumed some (but not all) of Carter's former job duties.").[3] When Carter retired on January 1, 2014, the Department did not promote Captain Dziwulski to the Battalion Chief position Carter left vacant. Pl.'s Opp'n 3; Def's Mem. 13–14.

Believing that the Department repeatedly had not promoted him because of his race, Captain Dziwulski filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 23, 2014. Pl.'s Opp'n 3; Def's Mem. 15. Interim Fire Chief Segal learned from Interim Deputy Chief Paul Moore that the firefighters filling in for Carter and performing the MDO function (a function that did not merit out-of-title pay) were not acting in the capacity of Battalion Chief (work that would have merited, and for which they were receiving, out-of-title pay), consulted with Moore and, on February 12, 2014, ordered that Deputy Chief Fletcher stop paying Captain Dziwulski and the others acting out-of-title pay. Fletcher Dep. 38:13–40:2; Segal Dep. 73:15–18, 87:15–18, 99:14–20; Pl.'s Opp'n 2, 20, 38; Def.'s Mem. 15–16.

---

created a Battalion Chief position and demoted Carter into it.

[3] "MDO is a function" that "lieutenants and captains, even . . . firefighters [and] paramedics" can perform. Ford Dep. 18:15–21, ECF No. 40-35. "It's not a title" or position. *Id.* According to Defendant, "MDO served in a 'traffic-cop' capacity by directing ambulances and emergency vehicles to area hospitals whose staff was immediately available to assist with patient care." Def.'s Mem. 14; *see* Segal Dep. 100:3–21.

On February 12, 2014, within three weeks of his EEOC filing, Captain Dziwulski learned that he no longer would receive "out-of-title pay" for "filling-in as BC and . . also perform[ing] the MDO function." Pl.'s Opp'n 20; Pl.'s Dep. 258–59. He filed a second EEOC Charge on March 6, 2014, alleging that this effective pay cut was in retaliation for his first EEOC Charge. Pl.'s Opp'n 3; Def's Mem. 16. The following month, the Department, then under the new leadership of Niles Ford, with Segal as Deputy Chief, reclassified the Battalion Chief position that Carter had held to Battalion Chief for Special Operations Command, a position for which Captain Dziwulski was not eligible. Pl.'s Opp'n 21; Def.'s Mem. 14. It remained vacant for fifteen months, until August 26, 2015, when it again was reclassified, this time to a fire reduction officer position, and the Department placed an African American in the reclassified position. Pl.'s Opp'n 22. Consequently, Captain Dziwulski once again was not promoted.

The EEOC found in Captain Dziwulski's favor on both charges and issued a Right to Sue Letter, Pl.'s Opp'n 3–4; Def.'s Mem. 1, after which he initiated this litigation. In Count I, he claims race discrimination based on the Department's failure to promote him to the open Battalion Chief position in May 2013, to the open Battalion Chief position in June 2013, or to the Battalion Chief position that reopened in January 2014 and then was reclassified in April 2014 and remained open until August 2015. Compl. ¶¶ 28, 31, 38, 49–53, 77, 107–113. He also claims that the Department discriminated against him by discontinuing his out-of-title pay. *Id.* ¶ 110. Count II is for retaliation, based on the Department's discontinuation of Captain Dziwulski's out-of-title pay and its reclassification of the Battalion Chief position that Carter had held.[4] *Id.* ¶ 118.

---

[4] Captain Dziwulski originally claimed retaliation based on the Department's failure to promote him in May and June 2013 as well, but he did not respond to Defendant's summary judgment arguments on those claims. *See* Pl.'s Opp'n 19–21, 38–41; Def.'s Reply 18. Accordingly, he has abandoned those claims. *See Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (concluding that plaintiff "abandoned her harassment claim by failing to address that claim in her opposition to [defendant's]

# **Standard of Review**

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 251. Although "a court should not weigh the evidence," *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249), if "a party fails to establish the existence of an element essential to that party's case" or "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,'" then summary judgment is proper, *id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23. In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

---

motion for summary judgment, or to offer clarification in response to [defendant's] reply brief").

# Discussion

## Race Discrimination

Captain Dziwulski claims that the Department discriminated against him based on race when it repeatedly failed to promote him and when it discontinued his out-of-title pay. Compl. ¶¶ 109–10. Pursuant to Title VII, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire . . . any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. 2000e-2(a). In lieu of relying on direct evidence of discrimination, a plaintiff may prove his claims through the *McDonnell Douglas* burden-shifting framework, under which he first must establish a *prima facie* case. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citing *McDonnell Douglas Corp, v. Green*, 411 U.S. 792 (1973)).

Generally, to establish a *prima facie* case of discrimination without direct evidence, a plaintiff must show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Harris v. Esper*, No. JKB-18-3562, 2019 WL 5423768, at *5 (D. Md. Oct. 23, 2019) (quoting *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of Appeals of Md.*, 566 U.S. 30 (2012)). A failure to promote "'constitutes an adverse employment action for the purposes' of Title VII." *Boarman v. Berryhill*, No. ELH-17-1175, 2018 WL 1609622, at *8 (D. Md. Apr. 3, 2018) (quoting *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 544 (4th Cir. 2003)). A "decrease in pay" also qualifies as an adverse employment action. *Id.* (quoting *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999)).

For a failure to promote claim specifically, a plaintiff must demonstrate that "(1) []he is a member of a protected group, (2) []he applied for the position in question, (3) []he was qualified for

that position, and (4) the defendant[] rejected h[is] application under circumstances that give rise to an inference of unlawful discrimination." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005). Additionally, "[i]n failure-to-promote cases, a plaintiff generally satisfies his burden on th[e] [fourth] element when he shows that the open position was filled by a person outside of the plaintiff's protected group." *Louis v. City of Rockville*, No. PX-16-1471, 2018 WL 1471681, at \*5 (D. Md. Mar. 23, 2018) (citing *Ghenoba v. Montgomery Cty. Dep't of Health & Human Servs.*, 209 F. Supp. 2d 572, 576 (D. Md. 2002), *aff'd*, 57 Fed. App'x 572 (4th Cir. 2003)); *see also Carter v. Ball*, 33 f.3d 450, 458 (4th Cir. 1994). Alternatively, he can show that "the position remained open." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007); *see also Raines v. Am. Fed'n of Teachers - Maryland Prof'l Employees Council, AFL-CIO Local 6197*, No. ADC-19-1266, 2019 WL 4467132, at \*7 (D. Md. Sept. 18, 2019) (same).

If Captain Dziwulski establishes a *prima facie* case, "the employer may then rebut the prima facie case by showing there was a legitimate non-discriminatory reason for the adverse action, after which the burden shifts back to the plaintiff to show that those reasons are pretextual." *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997) (citation omitted); *see also Anderson*, 406 F.3d at 267. "A plaintiff alleging a failure to promote can prove pretext by showing that [he] was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Mott v. Accenture, LLP*, No. PX-17-231, 2019 WL 1934727, at \*15 (D. Md. Apr. 29, 2019) (quoting *Coleman v. Schneider Elec. USA, Inc.*, 755 F. App'x 247, 249 (4th Cir. 2019) (quoting *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006))).

*1.    Prima Facie Case*

Defendant does not dispute that Captain Dziwulski can establish the first three prongs of the *prima facie* case. Defendant argues that Dziwulski is unable to establish the fourth prong, "circumstances that give rise to an inference of unlawful discrimination," for any of the times the Department failed to promote him. Def.'s Mem. 18–19. According to Defendant, "[t]here is simply no nexus between Plaintiff's race and the reasons he was not promoted to Battalion Chief on any of the[se] occasions." *Id.* at 19. I disagree.

The following facts are undisputed. First, Captain Dziwulski is Caucasian, and the two open Battalion Chief positions in May 2013 and the Battalion Chief position created in June 2013 were filled by African Americans. Second, when Carter retired in January 2014, his Battalion Chief position remained open. Third, Carter's position was reclassified twice (rendering Captain Dziwulski ineligible) and ultimately filled by an African American. These facts satisfy the fourth prong of Dziwulski's *prima facie* case. *See Holland*, 487 F.3d at 214; *Raines*, 2019 WL 4467132, at *7; *Louis*, 2018 WL 1471681, at *5.

In Defendant's view, despite these facts, there are no circumstances giving rise to an inference of unlawful discrimination. Defendant's arguments are unconvincing. With respect to the May 2013 promotions, Defendant insists that a reasonable factfinder could not infer discrimination because the planning for the two new Battalion Chief positions and the selection of Claggett and Stokes for those positions in early May 2013 began before Captain Dziwulski was on the Eligibles List. Def.'s Mem. 20–22. Not so. The final decision to promote Claggett and Stokes (and not Dziwulski) is the only part of the process that qualifies as an adverse employment action for purposes of a discrimination claim. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 62 (2006) (noting that the statutory

language "explicitly limit[s] the scope of [Title VII's anti-discrimination] provision to actions that affect employment or alter the conditions of the workplace"). *Cf. Faghuyi v. Prince George's Cty.*, No. GLH-17-2876, 2018 WL 2290705, at *3 (May 18, 2018) (noting that an "'intent' to terminate" an employee is "not a final decision" and therefore not an adverse employment action). Regardless when the planning began and selections were made, the final decision occurred when Captain Dziwulski was eligible for promotion—and Claggett and Stokes no longer were. *See* Def.'s Mem. 23 ("[Clack] refused to allow an 'administrative oversight' . . . to force his hand in not proceeding with promotions from the 2011 List. As he stated in his deposition testimony, he understood that from whichever List he used, someone from the other List would feel disappointed. He therefore decided to proceed with his original decision and promote from the 2011 List." (citations to deposition omitted)). The timing of the planning and selection does not create a genuine dispute of material fact concerning the inference of unlawful discrimination under these circumstances.

Taking a different tack, Defendant contends that, "[b]ecause the BCFD [Baltimore City Fire Department] is governed by the 'Rule of One', application of the fourth prong of a *prima facie* [case], as Plaintiff recommends, is rendered meaningless, as the Department's motivation for its selections is not considered." Def.'s Reply 4. This argument is also unavailing.

It is undisputed that the Department is supposed to follow the "Rule of One" and, in theory, has no discretion in its promotions to Battalion Chief; it promotes the employee ranked first on the applicable Eligibles List. *See* Def.'s Mem. 5; Pl.'s Opp'n 6. The record before me shows, however, that the Department did not follow the Rule of One. As of May 13, 2013, Captain Dziwulski was ranked first on the Eligibles List, but he was not promoted for either of the two open Battalion Chief positions when they were filled on that day. And in June 2013, he was ranked first, yet he was not promoted to the newly-created Battalion Chief position. Nor was he promoted to the open position in 2014, when he still was ranked first.

Further, Defendant admits that the decisionmakers exercised considerable discretion with respect to the promotions and position reclassification. In May and June 2013, Clack exercised his discretion in deciding to promote Claggett and Stokes from the May 2011 Eligibles List and to place Carter in a Battalion Chief position. *See* Def.'s Mem. 8–9 (noting that, when the Battalion Chief positions were not approved in time for Clack to promote Claggett and Stokes from the May 2011 Eligibles List, he "had to decide what to do next," and he "ultimately decided to proceed with his original intention and appoint from the 2011 List"); *id.* at 6–7 ("Clack had to decide what to do with former Assistant Chief Lloyd Carter . . . whose position was being abolished. . . . Clack offered Carter the option of demoting into an EMS Battalion Chief position or retiring from the Department."). After Clack retired, Interim Fire Chief Segal then exercised his discretion to reclassify the Battalion Chief position that Carter had held, making it a Battalion Chief for Special Operations Command ("SOC") because "the position would be more useful in SOC." Def.'s Mem. 14.

Based on the record before me, the Rule of One was not followed and appears to have been disregarded when the Department filled the open Battalion Chief positions and did not promote Captain Dziwulski on any of these occasions. Taking the facts in the light most favorable to Plaintiff, Captain Dziwulski has shown that each time the Department exercised its discretion, it promoted an African American or left the position open. Accordingly, he has established a *prima facie* case of discriminatory failure to promote. *See Holland*, 487 F.3d at 214; *Raines*, 2019 WL 4467132, at *7; *Louis*, 2018 WL 1471681, at *5. [5]

---

[5] As another ground for defeating Plaintiff's *prima facie* case, Defendant argues that Fire Chief Clack's testimony establishes a legitimate reason for placing Carter into the third Battalion Chief position instead of promoting Dziwulski. Def.'s Mem. 25. The Court does not consider the Department's explanation until the second step of the burden-shifting framework, after the Plaintiff has established a *prima facie* case. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) ("Under that three-step framework, the plaintiff-employee must *first* prove a *prima facie* case of discrimination

Defendant contends that the Department had a legitimate, non-discriminatory reason for each of its decisions regarding the open Battalion Chief positions.  Def.'s Mem. 28.  According to Defendant, the May 2013 vacancies existed because Clack "create[d] two Battalion Chief EMS positions" through a "process" that Clack began months earlier in February 2013 by obtaining the approval of two local unions whose membership would be affected.  Def.'s Mem. 21.  It was the end of April before he had the support of one union and agreement from the other not to oppose the request for the new positions.  *Id.*  The Board of Estimates still had to approve the positions before they could be filled.  *Id.*  That step should have happened on May 8, 2013, but the item was not added to the Board's agenda due to "administrative oversight."  *Id.*

Defendant argues that, throughout the entire process, Clack was planning to promote Claggett and Stokes into the two new positions.  They were ranked first and second on the Eligibles List in effect at the time.  To make their promotions possible despite the Board's failure to act on May 8, 2013, Clack promoted them on May 13, 2013, before the Board approved the positions.  To do so, he "used the City's *in lieu* procedures to place Claggett and Stokes into Battalion Chief positions, *in lieu* of Executive Level I and Command Staff II slots, only until the anticipated Battalion Chief positions were approved by the BOE [Board of Estimates]."  Def.'s Mem. 9 (footnote omitted).  The Board approved the positions on May 15, 2013.  Defendant asserts that, "[a]lthough the purpose of the *in lieu* policy was to allow an employee to gain experience in a position in hopes of promoting into that position, the Department's practice had been to also use the *in lieu* policy as a 'placeholder' until a position is created."  *Id.*  By the time Clack acted on May 13, 2013, the Eligibles List that included

_____

by a preponderance of the evidence.  *If []he succeeds*, the defendant-employer has an opportunity to present a legitimate, non-discriminatory reason for its employment action." (emphases added)).

Claggett and Stokes had expired. Def.'s Mem. 11; Pl.'s Opp'n 11–12. Although it is disputed whether Clack was aware at the time that the list had expired, Clack clearly knew that the time in which he could promote Claggett and Stokes soon would expire. *See* Def.'s Mem. 8–9 (stating that, after the promotions were not included on the May 8, 2013 Board meeting agenda, Clack "had to decide what to do next" because "[t]he current Eligibles List was due to expire prior to the next meeting of the BOE on May 15, 2013"). In Defendant's view, Clack's reasons for his actions regarding the May 2013 promotions were legitimate and non-discriminatory because, following his discussions with the unions, "there was an expectation on the part of the unions and [their] membership that the promotions would be off the 2011 Eligibles List," so he "decided to proceed with his original decision and promote from the 2011 List." *Id.* at 23–24.

With respect to the creation of the Battalion Chief position in June 2013, Carter's placement into it, and its subsequent reclassification, Defendant insists that the Department also had legitimate, non-discriminatory reasons for those decisions. Def.'s Mem. 25–26. Defendant contends that the position was created as an alternative to retirement for Carter, when he "was 'struggling in his position as Deputy Chief,'" *id.* at 25, and it was reclassified when Carter retired, because EMS no longer needed the position, *id.* at 14.

Based on the record before me, I find that there are legitimate, non-discriminatory reasons for the Department's decisions.

3.      *Pretext*

In response to these legitimate, non-discriminatory reasons, Captain Dziwulski argues that the Department's reasons for its actions pertaining to how it handled the open Battalion Chief positions in 2013 and 2014 are all pretext. Pl.'s Opp'n 26–37. As evidence that it was actually race that motivated the Department's decisions, Dziwulski notes that Clack decided "to exercise discretion as

to who[m] to select for BC promotion in May 2013" (and chose two African Americans instead of Dziwulski, a Caucasian) when Department policy prevented him from permissibly exercising any discretion in the decision. *Id.* at 26–27. It is undisputed that Claggett's and Stokes's promotions were finalized after the 2011 Eligibles List expired, *see* Def.'s Mem. 8–9, 23, and Department policy required Battalion Chief promotions to be in accordance with the current Eligibles List, Clack Dep. 37:22–38:1. Indeed, Defendant acknowledges that the Department "did not follow some City, departmental and MOU guidelines" when it promoted Claggett and Stokes instead of Dziwulski. Def.'s Mem. 22. An employer's "violation of its own regulations can have probative value when a plaintiff seeks to show pretext." *Lockley v. Town of Berwyn Heights*, No. JFM-14-825, 2015 WL 5334256, at *8 (D. Md. Sept. 11, 2015) (citing *Blasic v. Chugach Support Servs., Inc.,* 673 F. Supp. 2d 389, 399 (D. Md. 2009)).

Dziwulski also asserts that "[w]ithin the BCFD, there were regular discussions about increasing diversity, and there was an 'undercurrent of race' in everything the Fire Chief did." Pl.'s Opp'n 6, 27 (quoting Clack Dep. 33:1–7, 46:7–20). Additionally, he contends that the Department's rationale for placing Carter in a Battalion Chief position in June 2013 was pretext because it was not a customary practice to demote employees with performance problems, and because the events leading up to Carter's placement included a race discrimination claim against the City by Carter, the release of "the City's study . . . showing a lack of diversity in the BC ranks," and Clack's "eliminat[ion] [of] the 'minority outreach' program [that] Carter headed." *Id.* at 36. Finally, Captain Dziwulski argues that there are discrepancies between the two Fire Chiefs' testimony that show that the Department's stated reasons for reclassifying the job were pretextual. *Id.* at 37. Fire Chief Clack's replacement, Segal, testified that the most recent Battalion Chief position was an "unnecessary" position that "Clack had just made-up." *Id.* Clack's testimony, on the other hand, was "the exact opposite," and "the City states, in its own memorandum that more BC positions 'were sorely needed.'" *Id.*

On the record before me, Defendant has offered a legitimate, non-discriminatory reason for

each of its employment decisions when considered individually. Thus, a reasonable jury, weighing the facts on the record before me as to each employment decision one at a time, could find that no race-based discrimination occurred. Nonetheless, considering the combined effect of these decisions, which collectively "undermine[] the credibility of the employer's stated reasons," Captain Dziwulski has identified sufficient evidence of pretext to survive Defendant's Motion for Summary Judgment. *See Coleman*, 755 F. App'x at 249; *Heiko*, 434 F.3d at 259; *Mott*, 2019 WL 1934727, at *15. As noted, the Department's failure to follow its "own regulations can have probative value . . . to show pretext." *Lockley*, 2015 WL 5334256, at *8. Further, although there is no evidence that there was "an 'undercurrent of race' in everything the Fire Chief did," as Plaintiff claims, Pl.'s Opp'n 6, 27,[6] it is undisputed that "it was a goal of the mayor . . . for . . . the department [to] look more like the City of Baltimore as far as race," Clack Dep. 37:3–7, and that race "would come up occasionally" as "an issue with respect to promotions within the Baltimore City Fire Department," *id.* at 46:7–13. Moreover, it also is undisputed that the Fire Chief had no discretion in Battalion Chief promotions, *id.* at 37:22–38:1, but for the promotions at issue in this case, Fire Chief Clack did exercise discretion, notwithstanding his testimony that he lacked the authority to do so. *See* Def.'s Mem. 6–7, 8–9, 23–24.

Additionally, the Department's reasoning for creating Carter's Battalion Chief position is somewhat inconsistent. Defendant asserts that "Clack needed to create a Battalion Chief position" to have a position "in which to place [Carter]" when his "command staff position was being abolished." Def.'s Mem. 12; *see* Segal Dep. 82:11–21 (testifying that Carter's former position was abolished for budgetary reasons). Clack testified that Carter "was struggling as a . . . deputy chief," and it was Clack's

---

[6] Clack testified that "[t]here was always discussions about diversity in Baltimore" and that "there's an under current of race in everything" in "the city." Clack Dep. 33:1–7. But, he said that he did not "think it's correct to say that there was a lot of conversation about race" in the Department; he said that "there wasn't . . . a daily or weekly conversation about race." *Id.* at 36:16–22.

"practice to try and accommodate people rather than fire them." Clack Dep. 53:6–14. According to

Clack, he did not create a Battalion Chief position simply to offer Carter a position to take instead of

retiring, although he did want to offer Carter "a job that he would be good at." *Id.* at 56:21–24, 57:9–

13. Rather, Clack created the position because the Department "needed some more focus on quality

control, and [it] needed somebody that when the battalion chief EMS was on vacation, [there was] a

person to fill in." *Id.* at 56:24–57:3; *see id.* at 162:4–7 (agreeing with counsel that "there was a clear

need for battalion chief EMS to do quality control" and "to fill in for the battalion chiefs EMS when

they were gone"). He also testified, however, that he did not know whether he would have created

the Battalion Chief position if Carter were not going to fill it. *Id.* at 54:1–14.

In contrast to Clack's statements about the Department's need for another Battalion Chief,

Interim Fire Chief Segal stated that, after Carter retired, if the Department had kept the Battalion

Chief EMS position as an EMS position, it "would have been wasting assets" because it "already had

enough battalion chiefs" in EMS. Segal Dep. 98:2–9. Defendant asserts that "Segal reasoned that

since the Battalion Chief position Carter held was, in his opinion, created solely as an option for Carter

to avoid forced retirement, the position was unnecessary—especially given that the Department had

only recently created two Battalion Chief positions into which Claggett and Stokes were promoted."

Def.'s Mem. 14. The reasons offered by Clack and Segal for the creation of the Battalion Chief

position given to Carter are sufficiently inconsistent that they raise more questions than answers about

why the position was created and why Carter was placed in it. "The fact that an employer has offered

inconsistent post-hoc explanations for its employment decisions is probative of pretext." *See Dennis

v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 646–47 (4th Cir. 2002) (finding that the employee

"provide[d] sufficient evidence of falsity" where "she provided evidence that [a supervisor] offered

inconsistent justifications for his promotion of [another employee]" and "[b]oth of [the supervisor's]

explanations . . . differed from the written job qualifications").

Most significantly, over the course of several months, Captain Dziwulski repeatedly was not selected for promotions for which he was eligible, even though he was ranked first on the Eligibles List in effect at the time. Each time, either African Americans were selected instead of him or the position was left open. Considering these events cumulatively, a genuine dispute exists regarding whether the Department's reasons each time were legitimate and non-discriminatory or pretext. Defendant's Motion for Summary Judgment is denied as to Captain Dziwulski's race discrimination claim based on failure to promote. *See Coleman*, 755 F. App'x at 249; *Heiko*, 434 F.3d at 259; *Munday*, 126 F.3d at 242; *Mott*, 2019 WL 1934727, at *15.

*Decrease in Pay*

Captain Dziwulski bases his final discrimination claim on the Department's discontinuation of his out-of-title pay. It is undisputed that Captain Dziwulski "fill[ed] in for Mr. Carter's battalion chief EMS position" and received acting out-of-title pay, which Deputy Chief Mark Fletcher had authorized. Fletcher Dep. 38:13–18, 41:13–18; Pl.'s Opp'n 19; Def.'s Mem. 3. It also is undisputed that, on February 12, 2014, Captain Dziwulski stopped receiving out-of-title pay. Pl.'s Opp'n 2; Def.'s Mem. 15. Thus, he experienced a decrease in pay.

Captain Dziwulski claims that the Department had "not ceased the 'acting pay' of African-Americans as it did against Plaintiff." Compl. ¶ 81. Yet, there is not a scintilla of evidence that the Department continued out-of-title pay for similarly situated African American employees when it discontinued it for Dziwulski and other Caucasian employees. Rather, Captain Dziwulski testified that the Department "stopped the acting out of title [pay he] was receiving" for serving in Carter's position, as well as the out-of-title pay for the others who were serving in that position, and "those individuals who were acting in that position were Caucasian." Pl.'s Dep. 63:18–64:6. He stated that the Department did not stop the acting out-of-title pay for Caucasians serving in other positions

and that he had "no knowledge" of Fletcher stopping any African Americans' out-of-title pay. *Id.* at 64:7–21. Interim Fire Chief Segal testified, without reference to race, that "EMS officers . . . , lieutenants and captains alike, as well Captain Dziwulski" were performing the Medical Duty Officer function, and he did not decide to stop "Dziwulski's acting pay" specifically, but rather decided that "[n]o one should be getting acting battalion chief [pay] when they're doing that [MDO] function." Segal Dep. 71:15–18, 72:15–17; *see also id.* at 102:15–103:10 ("It wasn't just Captain Dziwulski. Was no one should be getting acting battalion chief over there."); Fletcher Dep. 37:20–38:4 (affirming that "other officers, other firefighters other than Mr. Dziwulski also filled in for Mr. Carter's BCEMS position when he was doing the MDO function and got acting out-of-title pay"). Consequently, Captain Dziwulski cannot show that he was treated differently "from similarly situated employees outside the protected class." *Harris*, 2019 WL 5423768, at *5 (quoting *Coleman*, 626 F.3d at 190). Indeed, he did not respond to Defendant's argument in his opposition, thereby abandoning the claim. *See* Pl.'s Opp'n; *Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (concluding that plaintiff "abandoned her harassment claim by failing to address that claim in her opposition to [defendant's] motion for summary judgment, or to offer clarification in response to [defendant's] reply brief"). Therefore, summary judgment is granted in Defendant's favor on Captain Dziwulski's race discrimination claim based on the discontinuation of his out-of-title pay. *See Coleman*, 626 F.3d at 190; *Harris*, 2019 WL 5423768, at *5.

### Retaliation

Captain Dziwulski claims that the Department retaliated against him twice for complaining of discrimination. First, on February 12, 2014, three weeks after he filed a Charge of Discrimination with the EEOC, Captain Dziwulski learned that he no longer would receive "out-of-title pay." Compl. ¶¶ 70, 72, 118. Second, in April 2014, about a month after Captain Dziwulski filed a second EEOC

Charge, the Department reclassified the Battalion Chief position that Carter had held, rendering Captain Dziwulski ineligible for it. *Id.* ¶¶ 75, 77, 118.

"Title VII prohibits an employer from . . . retaliating against an employee for complaining about prior discrimination or retaliation." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citing 42 U.S.C. § 2000e-3(a)). As with discrimination claims, an employee may prove his retaliation claim "either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas* . . . ." *Id.* To prevail on a Title VII retaliation claim through the burden-shifting framework, an employee first must demonstrate: "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Johnson v. United Parcel Serv., Inc.*, No. JKB-19-1916, 2020 WL 231379, at *6 (D. Md. Jan. 15, 2020) (quoting *Coleman*, 626 F.3d at 190). For the second element, "[a]dverse employment action in the retaliation context means action which 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' In other words, the adverse employment action complained of must rise above 'petty slights, minor annoyances, and simple lack of good manners.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted)). At this stage, "the burden for establishing causation . . . is 'less onerous'" than it is for proving pretext on a retaliation claim. *Foster*, 787 F.3d at 251.

Once an employee establishes a *prima facie* case, the burden shifts to the employer "to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason," and, "[i]f the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* at 250 (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)). "Unlike discrimination plaintiffs, retaliation plaintiffs are limited to 'traditional principles of but-for causation' and must be able to prove that 'the

unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Foster*, 787 F.3d at 249 (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). That is, the employee must be able "to prove that retaliation was the actual reason for the challenged employment action." *Id.* at 252.

*Decrease in Pay*

Defendant acknowledges that Captain Dziwulski "can establish a *prima facie* claim of retaliation concerning his acting-out-of-title pay." Def.'s Mem. 30. In its view, Captain Dziwulski's retaliation claim based on the discontinuation of his out-of-title pay fails because "he is unable to dispute that the City had a legitimate business reason for discontinuing that pay." *Id.* Indeed, "[i]t is insufficient merely 'to show that the motive to [retaliate] was one of the employer's motives'"; the employee cannot prevail "'if the employer also had other, lawful motives that were causative in the employer's decision.'" *Murphy-Taylor v. Hofmann*, 968 F. Supp. 2d 693, 721 (D. Md. 2013) (quoting *Nassar*, 570 U.S. at 343).

According to Defendant, the out-of-title pay that the Department discontinued was "for serving as MDO," a function that did not merit out-of-title pay. Def.'s Mem. 15. Interim Fire Chief Segal learned "that BCFD members, including Lieutenants, and Captains (including Plaintiff), were being paid out-of-title pay for serving as MDO" in February 2014, and he "immediately ordered that out-of-title be discontinued for *all* members serving as MDO." *Id.* This is a legitimate, non-retaliatory motive that was "causative in the employer's decision" *See Peoples v. Marjack Co.*, No. AW-08-178, 2010 WL 889567, at *11 (D. Md. Mar. 5, 2010) (concluding that the plaintiff did not "present[] sufficient evidence to show that the Defendant's proffered reason for her termination—violation of company policy—[was] a pretext for retaliation" where the defendant had "show[n] that it ha[d] terminated three other employees outside of the protected class who did not file EEOC complaints,

for violating the time card policy"); *cf. Sherif v. Univ. of Md. Med. Ctr.*, 127 F. Supp. 3d 470, 480 (D. Md. 2015) (noting that "'[c]omparator evidence'—that is, 'evidence that other employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably'— is highly relevant to demonstrating pretext" (quoting *Laing v. Fed. Exp. Corp.,* 703 F.3d 713, 719 (4th Cir. 2013))). Unless Captain Dziwulski proves that this reason is false and that the actual reason was retaliatory, it is sufficient to defeat his claim of retaliation. *See Nassar*, 570 U.S. at 343; *Foster*, 787 F.3d at 249; *Murphy-Taylor*, 968 F. Supp. 2d at 721.

Captain Dziwulski does not dispute that employees are not entitled to out-of-title pay for performing the MDO function. Instead, he insists that it is a false reason, at least with regard to his pay, because he was not simply performing the MDO function but also serving as Battalion Chief, in Carter's position. Pl.'s Opp'n 38. In his view, the work he was performing qualified as the work of a Battalion Chief because the Department "placed other BCs in the same position for which Plaintiff was 'acting-in'" and Carter—for whom Dziwulski was filling in when he received out-of-title pay— served as a Battalion Chief. *Id.* Dziwulski insists that, contrary to his testimony at his grievance hearing, "he had performed the two tasks" required for a Battalion Chief, that is, "writing or developing a job description, and assuming field operations." *Id.* at 38 & n.33.

Defendant responds that, regardless what Carter's position was or what work Dziwulski did, Dziwulski was not actually serving as a Battalion Chief because, as Dziwulski himself testified at his grievance hearing, he "did not assume the full duties of a Battalion Chief during Carter's absence." Def.'s Mem. 15–16. Additionally, in Defendant's view, even if Captain Dziwulski was performing all tasks required to merit out-of-title pay for serving as Battalion Chief, Interim Fire Chief Segal—who made the decision to eliminate out-of-title pay—was not aware that Dziwulski was doing anything more than performing the MDO function, and therefore its legitimate, non-retaliatory reason is unaffected by what work Dziwulski actually performed. Def.'s Reply 18–19. Indeed, Segal testified

in his deposition that it was his understanding that Dziwulski was receiving out-of-title pay "[f]or the functions of . . . the MDO position. . . . That's what he was supposed to have been doing." Segal Dep. 98:14–99:4. When asked whether he "ha[d] any knowledge that [Dziwulski] was performing battalion chief duties," Segal said: "No, none." *Id.* at 99:21–100:2. In light of the undisputed evidence that Segal made the ultimate decision to eliminate out-of-title pay and Segal's undisputed belief that Dziwulski was performing the function of the MDO position only when he ordered a decrease in pay, the work Dziwulski actually performed is not material. Moreover, Dziwulski has failed to show that the Department's legitimate, non-retaliatory reason for eliminating the out-of-title pay was false. Nor has he offered any evidence that the actual reason was retaliatory. Insofar as Dziwulski argues that "even if Plaintiff (and others were not doing all BC work) [sic], the facts still show that but for Plaintiff's protected activity, the acting pay would have continued," Pl.'s Opp'n 39, he does not present any evidence in support of this argument.

Dziwulski insists that temporal proximity and "the City's outright lie to the EEOC" are enough to establish pretext. Pl.'s Opp'n 39. It is true that Fire Chief Niles Ford informed the EEOC that "*Deputy Chief Fletcher* . . . after reviewing [Dziwulski's] job responsibilities, found that the job did not require the skills or abilities of a Battalion Chief," Mar. 17, 2015 Ltr. to EEOC, Segal Dep. Ex. 18 (emphasis added), whereas Fletcher testified that this explanation was "[f]alse"; he simply did as *Moore* told him to do, Fletcher Dep. 38:19–42:3. This is not, however, a "cover-up [for] retaliation," as Plaintiff contends. *See* Pl.'s Opp'n 20. Regardless who considered the responsibilities for the firefighters filling in for Carter, the Department reached the legitimate, non-retaliatory conclusion that the role was to perform the MDO function only and therefore did not merit out-of-title pay. Thus, the apparent inaccuracies in the EEOC response statement also are not material. Consequently, the only basis Dziwulski has identified for finding pretext is temporal proximity.

While temporal proximity of events may establish a prima facie case for retaliation, "temporal proximity alone does not rebut [a defendant's] legitimate, and uncontested, ground of termination." *Simons v. Mi-Kee-Tro Metal Mfg., Inc.*, No. PJM-18-1270, 2019 WL 4143005, at *5 (D. Md. Aug. 30, 2019) (quoting *New v. Family Health Care, P.C.*, 2019 WL 2744682 (D. Md. 2019)). In *Simons*, this Court granted summary judgment in the defendant's favor on the plaintiff's retaliation claim because, beyond temporal proximity, the plaintiff did not offer any "facts to refute [the defendant's] stated reason for his termination as pretextual." *Id.*; *see also New*, 2019 WL 2744682, at *5 (concluding that "temporal proximity alone d[id] not rebut Defendants' legitimate, and uncontested, ground of termination"); *Yancey v. Nat'l Ctr. on Insts. & Alts.*, 986 F. Supp. 945, 956 (D. Md. 1997) (concluding that plaintiff "established a prima facie case of retaliatory discharge under Title VII" based on temporal proximity, but granting defendant's motion for summary judgment because the defendant "presented a legitimate, non-retaliatory reason for [the plaintiff's] discharge" and the plaintiff "failed to meet her final burden under the *McDonnell Douglas* analysis, given that she did not "present[] any evidence beyond temporal proximity . . . to show that she would not have been discharged 'but for' her complaints of sexual harassment" and therefore did not "establish[] that [the defendant's] proffered reason [was] a pretext for a true retaliatory one"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998). Here, also, Dziwulski cannot rely on temporal proximity alone to show that the Department's stated reason for eliminating out-of-title pay was pretext and its actual reason was retaliatory, and he has not identified any material facts that create a genuine dispute regarding the Department's reason. Therefore, I will grant Defendant's motion for summary judgment as to Dziwulski's claim for retaliation based on his decrease in pay. *See Simons*, 2019 WL 4143005, at *5; *New*, 2019 WL 2744682, at *5.

*Reclassification of Carter's Position*

Captain Dziwulski claims that, when the Department reclassified the Battalion Chief position that Carter held (for which Dziwulski was "next-in line to be promoted") in April 2014, rendering

Dziwulski ineligible for it, it did so "in retaliation for Plaintiff objecting to the discrimination." Compl. ¶¶ 77, 118. A reasonable jury could find that the April 2014 reclassification "reduced [Plaintiff's] opportunities for promotion" and therefore qualifies as an adverse employment action. *See Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). Additionally, it is undisputed that Dziwulski had filed an EEOC charge in March 2014, only a month before the position was reclassified. Compl. ¶ 75; Def.'s Mem. 16, 30. Therefore, the temporal proximity between the two events could support a finding of a causal connection, if there is no other evidence to negate the inference. *See, e.g.*, *Wilson v. Montgomery Cty. Bd. of Trustees*, No. PWG-17-2784, 2018 WL 4300498, at *9 (D. Md. Sept. 10, 2018) (noting that "evidence of deficient work performance could negate a causal inference based on temporal proximity").

According to Defendant, there is evidence to negate the inference of a causal connection, because the adverse employment action began, not when the position actually was reclassified in April 2014, but rather in December 2013, when Segal announced his intention to abolish and reclassify the position. Def.'s Mem. 30; Dec. 16, 2013 Ltr. to Union, ECF No. 40-36 (stating that the Department "intend[ed] to abolish [Carter's position]"). On that premise, Defendant insists that Dziwulski cannot establish a *prima facie* case for retaliation, because Dziwulski did not engage in any protected activity before December 2013 and therefore he cannot demonstrate a causal connection. *See* Def.'s Mem. 30.

Whether the December 2013 announcement itself qualifies as an adverse employment action or whether the announcement was merely the beginning of a process that culminated in an adverse employment action is a question of fact for the jury to determine. *See White v. Gaston Cty. Bd. of Educ.*, No. 16-552, 2018 WL 1652099, at *10 (W.D.N.C. Apr. 5, 2018) ("The record reflects plaintiff's enthusiasm for the proposed transfer, and that defendant was aware of plaintiff's enthusiasm. By rescinding the proposed transfer and sending him to another school shortly after his outspoken

conduct, a reasonable jury might conclude that defendant's action was intended to dissuade plaintiff from supporting any more charges of discriminatory conduct. As such, whether plaintiff's rescinded transfer and reassignment constituted a materially adverse employment action is a question of fact for the jury to decide, not the court."); *see also Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57, 62 (2006) (noting that, for a discrimination claim, the statutory language "explicitly limit[s] the scope of [Title VII's anti-discrimination] provision to actions that affect employment or alter the conditions of the workplace," whereas "[n]o such limiting words appear in the antiretaliation provision"). Either way, it is undisputed that the reclassification process began when Interim Fire Chief Segal announced his intention to abolish and reclassify the Battalion Chief position in December 2013, before Dziwulski filed his EEOC Charges. Def.'s Mem. 14, 30; Pl.'s Opp'n 41; Dec. 16, 2013 Ltr. to Union. Therefore, Dziwulski cannot show causality based on the timing of his March 2014 EEOC Charges and the April 2014 finalization of the reclassification alone. He must demonstrate the causal connection through additional evidence, which he argues that he can do through evidence that he engaged in protected activity in May, June, and November 2013. Pl.'s Opp'n 40.

1.    *Prima Facie Case*

Title VII defines protected activity as

conduct "oppos[ing] any practice made an unlawful employment practice[.]" 42 U.S.C. § 2000e-3(a). Protected activity is expansive and "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

*Hamilton v. Prince George's Cty. Police Dep't*, No. DKC 17-2300, 2018 WL 1365847, at *6 (D. Md. Mar. 16, 2018). "[T]he threshold for oppositional conduct is not onerous," and the Court "must examine the course of a plaintiff's conduct through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as a whole." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417,

418 (4th Cir. 2015) (noting that the Sixth Circuit defined protected activity to include "complain[ing] about unlawful practices to a manager, the union, or other employees" (quoting *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009))). Notwithstanding this broad definition, "to qualify as protected activity, a person must attempt to assert federal rights against discrimination." *Hamilton*, 2018 WL 1365847, at *6. That is, the employee must "'communicate[] to her [or his] employer a belief that the employer has engaged in . . . a form of employment discrimination'" by at least "stat[ing] generally that a person is a victim of discrimination." *Id.* (quoting *Bowman v. Balt. City Bd. of Sch. Comm'rs*, 173 F. Supp. 3d 242, 248 (D. Md. 2016) (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276 (2009))).

Captain Dziwulski argues that he engaged in protected activity "[i]n November 2013, at the Labor Commissioner hearing over the May 2013 promotions, [when he] specifically objected to the Claggett and Stokes emails which contained race-based appeals." Pl.'s Opp'n 40. He concedes that he "did not use the term 'discrimination'" but contends that, because "Claggett and Stokes were obviously of a different race . . . , when combined with the nature of their emails, there was more than inference Plaintiff was objecting to the race discrimination." *Id.* He also argues that he engaged in protected activity in May 2013, "when he presented his first step grievance to a BCFD management official and a Union official" and "specifically stated that the reason he was not promoted was because of race." *Id.* Additionally, he asserts that in June 2013, "[i]n an email string . . . on which Chief Segal [was] cc'd, Plaintiff asked for 'same equal opportunity' to meet with Chief Clack, as he did with Claggett and Stokes." *Id.*

On May 26, 2013, Dziwulski "presented his first step grievance to management official BC [Laura] Shiloh, with the Union Vice President [George Jones] (a 28-year BCFD employee and 20-year lieutenant) present, and specifically identified race as the reason he was not promoted." Pl.'s Opp'n 13; *see id.* at 40; Pl.'s Dep. 38:14–18; Shiloh Dep. 8:16–18 (stating that she has been a Battalion Chief

for the Department for almost twelve years).  Certainly, he did not allege race in the grievance itself.  Pl.'s Dep. 145:20–146:1 ("Q  Did you allege race in that first grievance in May of 2013 that you filed?  A  No.").  Yet he, Jones, and Shiloh "discussed that the promotions were based on race" when Jones presented his grievance to Shiloh.  *Id.* at 145:10–14; *see* Shiloh Dep. 8:4–15.  Thus, Jones and Shiloh were aware that Dziwulski was grieving that he was not promoted because of race.  *See* Pl.'s Dep. 145:10–14; Shiloh Dep. 8:4–15.

Defendant argues that, notwithstanding this communication, Dziwulski did not communicate his grievance to the Department because "[n]either Battalion Chief Shiloh nor Union Vice President George Jones are command staff members of the BCFD" and "there is no indication that [Chief Clack's replacement, Interim Fire Chief] Segal was informed of their alleged discussion."  Def.'s Reply 20.  It is true that, when asked if he knew whether Shiloh or Jones "mentioned to Chief Clack that [he] believed that [he was] discriminated against on account of race," Dziwulski answered that he did not know.  Pl.'s Dep. 146:2–9.  But, considering the Fourth Circuit's "'expansive view'" of protected activity, "complaints of discrimination made to an FOP shop steward"—that is, a union representative such as Jones—"constitute protected activity."  *Hamilton*, 2018 WL 1365847, at *7 (quoting *DeMasters*, 796 F.3d at 417; citing *Barrett*, 556 F.3d at 516).  Thus, when Dziwulski presented a grievance and his Union's vice president, as well as a Battalion Chief in the Department, understood it to be based on race, he "communicate[d] to [his] employer a belief that the employer has engaged in . . . a form of employment discrimination."  *Crawford*, 555 U.S. at 276; *see also DeMasters*, 796 F.3d at 417; *Barrett*, 556 F.3d at 516; *Hamilton*, 2018 WL 1365847, at *6.  Therefore, taking the facts in the light most favorable to Dziwulski, he engaged in protected activity on May 26, 2013.  *See Crawford*, 555 U.S. at 276; *see also DeMasters*, 796 F.3d at 417, 418; *Barrett*, 556 F.3d at 516; *Hamilton*, 2018 WL 1365847, at *6; *Bowman*, 173 F. Supp. 3d at 248.

On June 14, 2013, Dziwulski emailed Clack and asked to meet with him regarding the

"Dziwalksi [sic] Grievance." June 25, 2013 Email, Clack Dep. Ex. 34 (discussing who would be present at the meeting he requested); Clack Dep.152:1–18. Dziwulski has not identified any evidence that he mentioned race in his email.

Captain Dziwulski asserts that he then again engaged in what he believes to be protected activity in November 2013, only one month before Segal's December 2013 announcement. Specifically, Dziwulski contends that, during his hearing before the Labor Commissioner, he "object[ed] to the race discrimination" that allegedly occurred when Claggett and Stokes were promoted instead of him. Pl.'s Opp'n 40. A review of the record before me shows that, when Dziwulski was testifying about the process leading to Claggett's and Stokes's promotions, he said that Captain Claggett was called "down to headquarters" on May 9, 2013 and was told that "he wasn't going to be promoted." Nov. 8, 2013 Hr'g Tr. 44:1–4, ECF No. 46-9. Dziwulski then said that, after Claggett learned that he was not going to be promoted, "there were a lot of *uncomfortable e-mails* that were sent out." *Id.* at 44:8–9 (emphasis added). In his view, if the Department used the *in lieu* procedure on May 8, 2013, it would not "have called [Claggett and Stokes] down on Thursday [May 9, 2013] and told them that [they were not being promoted] because there are some people that are so upset when they're not promoted that they say things that they don't want to say." *Id.* at 44:9–13.

Even though Captain Dziwulski did not mention race, the November 2013 hearing was the culmination of the grievance process he began in May 2013, at which time both the union representative and the Battalion Chief who received the grievance, Shiloh, understood that Dziwulski was complaining that the Department made a race-based decision to promote Claggett and Stokes instead of him. When I "examine the course of a plaintiff's conduct through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as a whole," as the Fourth Circuit requires, I find that a reasonable jury could conclude that the grievance process, which began in May 2013 with a specific recognition that Dziwulski complained of race discrimination in the grievance,

and ended with the November 2013 hearing about the Department's promotion of Claggett and Stokes instead of Dziwulski, qualified as protected activity. *See DeMasters*, 796 F.3d at 418.

Further, the conclusion of the grievance process at the November 8, 2013 hearing was sufficiently close in time to Segal's December 16, 2013 announcement that Carter's Battalion Chief position would be reclassified to give rise to an inference of causality. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (six-week lag between protected activity and adverse employment action is sufficiently short "to establish a *prima facie* case of retaliation"). Thus, the Department announced the plan to reclassify the Battalion Chief position one month after Dziwulski's race-based grievance culminated in a hearing, and then it moved forward with the reclassification one month after Dziwulski filed a second EEOC Charge. Taking the facts in the light most favorable to Dziwulski, I find that a reasonable factfinder could conclude on the record before me that the Department reclassified Carter's position in response to the protected activity in which Dziwulski engaged, and Dziwulski has established a *prima facie* case of retaliation based on the reclassification of Carter's position. *See Johnson*, 2020 WL 231379, at *6–7; *Penley*, 876 F.3d at 655–57.

2. *Burden-Shifting Framework*

The burden shifts to Defendant to "show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason," but Defendant, by failing to address the issue in its briefing, has not met its burden. *See Foster*, 787 F.3d at 250 (quoting *Hill*, 354 F.3d at 285). Thus, given that, taking the facts in the light most favorable to Plaintiff, Captain Dziwulski has established a *prima facie* case of retaliation based on the reclassification of Carter's position, Defendant cannot prevail on its summary judgment motion with regard to this claim. Accordingly, its motion is denied as to this claim. *See id.*

**Conclusion**

In sum, Defendant's Motion for Summary Judgment, ECF No. 40, is granted in part and denied in part. It is granted as to Captain Dziwulski's claim for race discrimination based on the decrease in his pay and as to all of Dziwulski's retaliation claims except for his retaliation claim based on the reclassification of Carter's position. It is denied as to Dziwulski's claim for race discrimination based on failure to promote and his retaliation claim based on the reclassification of Carter's position. I will schedule a conference call with the parties to select trial dates for those claims. Captain Dziwulski's Motion to File a Surreply, ECF No. 47, is granted, and the Surreply, ECF No. 47-1, is accepted as filed.

A separate order will issue.

Date: <u>March 3, 2020</u>        <u>  /S/    </u>
                   Deborah L. Boardman
                   United States Magistrate Judge

lyb